[No. 36400. Department One. April 4, 1963.]

BETTY L. CRIPPEN, *Appellant*, v. ROBERT PULLIAM, *Respondent.*\*

\*Reported in 380 P. (2d) 475.

*Benson & McNair* and *Lee R. McNair*, for appellant.

*Atwell, Moore, Walstead & Hallowell, Ronald Moore,* and *Alan Hallowell,* for respondent.

HUNTER, J.—This is an appeal from a judgment entered upon a jury verdict for the defendant (respondent) in a malpractice case.

On October 25, 1957, the Superior Court for Cowlitz County adjudged the plaintiff (appellant), Betty Crippen, to be a delinquent child. Betty, a minor girl 15 years of age, had been abandoned by her mother at 3 months of age and, at the time of the delinquency hearing, was living with her father and stepmother. She was made a ward of the court and was committed to the care and custody of the Home of the Good Shepherd in Seattle. In a subsequent order dated November 14, 1957, it was directed that she be placed in a school or home by the Children's Division of the Department of Public Assistance of Cowlitz County for care and supervision. Written reports to the court were to be made each 3 months. The father was directed to contribute such amount as he was financially able to pay toward the cost of Betty's care, supervision and training.

It was discovered that Betty was experiencing difficulty with her hearing and, on November 27, 1957, she was taken by Mrs. Gerry Palmateer, a caseworker for the department, to a public hearing clinic where she was examined by the

defendant, Dr. Robert Pulliam, who was an otolaryngologist (eye, ear, nose and throat specialist). His examination disclosed that Betty had large perforations in both ear drums and an interruption of the ossicular chain on the right side, resulting in a severe hearing loss in the right ear and a moderate loss of hearing in the left ear. This information was communicated to Mrs. Palmateer. After another examination was held in Dr. Pulliam's office on December 3, 1957, and upon reviewing the X-ray photographs which were taken, the defendant recommended to Mrs. Palmateer that Betty have tympanoplasty operations on both ears, starting with the right ear since it was the worse. He explained that the operation consisted of grafting skin over the perforations in the ear drums and in freeing up the vibrator bones. On the following day, Mrs. Palmateer communicated this information to Betty's father. Written consent to the surgery was signed by the father at the Cowlitz General Hospital in Longview on December 9, 1957.

The record discloses that a tympanoplasty is what may be referred to as a refinement or extension of a mastoidectomy. After the mastoid process has been removed, a piece of skin is grafted over the hole of the ear drum, and the obstructions in the ossicular chain are removed. The surgery is performed by making an incision behind the external ear flap and digging with a curette through the mastoid bone to the mastoid antrum which, in turn, gives entrance to the middle ear where the graft is placed on the perforated drum from its interior or back side.

The tympanoplasty was performed on Betty's right ear on December 10, 1957. While proceeding with a curette through the bony mastoid structure during the course of the operation, the defendant observed a light gray substance which he assumed was the mucosa lining of the mastoid antrum. This material was located at a point where the antrum is normally found. Because the appearance of the mucosa lining of the antrum is similar to that of the seventh facial nerve, Dr. Pulliam probed it gently two times and had the anesthesiologist watch for a twitch on the

patient's face. Having observed no twitch, he concluded the tissue was the mucosa lining. Within moments after he had cut into the tissue with his curette, he realized, however, that he had severed approximately two-thirds of the nerve. He then called Dr. David DeWeese, a nerve specialist in Portland, Oregon, for consultation, after which he attempted to repair the nerve. Having sutured the nerve tissue, he proceeded with the tympanoplasty surgery and closed the incision.

Betty sustained virtually a complete paralysis of the right side of her face. Several weeks later, Dr. DeWeese performed nerve graft surgery for the repair of the damaged nerve which resulted in substantial improvement of her condition. However, a schizophrenic condition developed from the operation, and Betty was committed to the Western State Hospital for a period of 1 year. Subsequent to her release from the mental hospital, she was married. The right side of her face remains disfigured and disabled from 10 to 65 per cent of normal with a prognosis of some improvement.

This action was instituted by Betty's guardian ad litem, Jack N. Bishop, against the defendant for the recovery of damages for injuries sustained by Betty as the result of the operation. After a jury trial and verdict for the defendant, the plaintiff commenced this appeal from the judgment of dismissal which was entered thereon.

The plaintiff assigns error to the trial court's holding that the defendant had valid and lawful consent to perform the operation as a matter of law and, in conjunction, to the trial court's failure to give her requested instructions relating to consent.

The plaintiff contends the trial court erred in ruling that the consent to the operation by the juvenile court was not necessary for a valid consent.

Whether a surgical operation may be performed upon a minor child without the consent of the natural guardian or of one standing in loco parentis to the infant is not in dispute. It is the plaintiff's position that the consent of the court was necessary since, by reason of RCW 13.04.010 and

the order of October 25, 1957, which declared her a delinquent child, she was a ward of the court and under the custody and control of the state. RCW 13.04.010 states, *inter alia*:

"...

"For the purpose of this chapter only, all delinquent and dependent children within the state shall be considered wards of this state and their persons shall be subject to the custody, care, guardianship and control of the court as hereinafter provided."

■ The question posed is whether, by this language, the legislature intended to divest the parents of all rights as natural guardians during the period which their child has been adjudged to be a delinquent child. In answering this question, the language must be construed in relation to . the entire section of the statute, *State ex rel. Port of Seattle v. Department of Public Ser.*, 1 Wn. (2d) 102, 95 P. (2d) 1007 (1939), and in light of the purpose and objective of the juvenile court act.

A "delinquent child" is defined in RCW 13.04.010 as follows:

"The words 'delinquent child' shall include any child under the age of eighteen years who violates any law of this state, or any ordinance of any town, city, county or city and county of this state defining crime; or who habitually uses vile, obscene, vulgar, profane or indecent language, or is guilty of immoral conduct; or who is found in or about railroad yards or tracks; or who jumps on or off trains or cars; or who enters a car or engine, without lawful authority. . . ."

■ It is not necessary under this definition that parents be determined unfit to have custody of their child in order for such child to be adjudged a delinquent child. The paramount purpose and object of the juvenile court act is to provide the court with authority to do those things essential for the moral, physical and mental well-being of minor children. This purpose is as consistent with *assisting* the parents in controlling the behavior of their children as well as with *divesting* the parents of their rights as natural guardians. The degree of authority exercised over a "de-

linquent child" to the exclusion of the parents' rights is dependent upon the wide discretion of the juvenile court in its evaluation of the facts of each case. The parent is therefore left with those rights which are not inconsistent or do not interfere with the specific purposes of the court in adjudging the child a delinquent.

■ In the instant case, the order of October 25, 1957 shows no indication of a finding of unfitness on the part of the natural father as a parent; the entry of the order was only by reason of the misconduct of his daughter, Betty. Neither the order nor the record in this case indicates any intention on the part of the court to divest the father of rights concerning the physical well-being of his daughter. The order reads, *inter alia*:

"The Girl stated that the Complaint as stated was true, that she knew she had done wrong, The Father and all in the Court room agreed *some training and help* must be had for the girl." (Italics ours.)

The above-quoted portion indicates to us that the purpose of the juvenile court was to *assist* the father in the control, training and correction of his daughter. Because it did not interfere with the purposes of the court, the father had the authority as natural guardian in the instant case to consent to the surgical operation performed by the defendant doctor. The trial court, therefore, did not err in ruling that the consent of the juvenile court was not necessary.

■ The plaintiff contends, however, that it was a jury question whether the father's consent had been obtained by the misrepresentation of material facts. She alleges the defendant did not talk to her father; that she and the case-worker were informed that the operation was to graft skin over the perforations of the ear drum by means of proceeding through the ear canal but failed to inform them the operative procedure involved the removal of the mastoid bone in a tympanoplasty operation; and that this information was, in turn, communicated to the father.

While we feel it would have been advisable for the defendant to have discussed the nature of such major

surgery with the father, there is no evidence of deceit or bad faith on the part of the defendant in securing the written permission from the father to proceed with the proposed operation. Moreover, the father was not limited in any way in making inquiry concerning the details of the surgery. It was his prerogative to rely on the professional judgment of the defendant without making further inquiry. The plaintiff's theory of deception in obtaining the father's consent is without merit.

In addition, the plaintiff contends the defendant exceeded his authority by operating on the right ear when the hospital record introduced into evidence shows a notation by the defendant to operate on the left ear. Such evidence, without explanation, is inconclusive, and the contention of the plaintiff is inconsistent with the written consent of the father which in no way limited the operation to the left ear.

The trial court was correct in taking the issue of consent from the jury.

The plaintiff assigns error to the trial court's giving of instructions Nos. 18, 19 and 25. No exceptions were taken to these instructions at the trial; therefore, they became the law of the case and no error may be assigned to them on appeal. *Seattle v. Harclaon,* 56 Wn. (2d) 596, 354 P. (2d) 928 (1960).

The plaintiff assigns error to the failure of the trial court to give her proposed instruction No. 33 relating to negligence in collecting data essential to a proper diagnosis. She argues that this instruction should have been given since the evidence which was introduced raised the issue as to the procedure that should have been followed *during the operation* to identify the seventh facial nerve. The requested instruction is not appropriate, however, because it relates to *preoperative* diagnosis and because there was no evidence of negligence on this issue to raise a jury question. The instruction was properly refused.

The plaintiff urges with great emphasis that the defendant was negligent, as a matter of law, for injuring her seventh facial nerve. It is her theory that there is no dis-

pute in medical standards of operative procedure that (1) live tissue must never be cut upon until it is identified, and (2) that the probing of tissue and the observing of a facial twitch is an unreliable method to determine whether the tissue is a facial nerve. She contends the evidence conclusively discloses that in probing and testing for a twitch on the patient's face, the defendant suspected the gray substance he encountered to be the seventh facial nerve; that, without dispute, the eliciting of a facial twitch is not a dependable test; and that the defendant failed to identify the nerve properly because he did not enlarge the hole, which he had curetted through the bone, thereby permitting him to observe the entire width of the nerve and definitely establishing its identification.

There is also medical testimony in the record to support the theory of the defendant that a surgeon may rely upon the anatomy in performing a tympanoplasty operation; that the plaintiff's anatomy was abnormal; that, in the instant case, the defendant was misled by the plaintiff's anatomy into believing that he had entered the mastoid antrum which is lined with mucosa having an appearance similar to that of the seventh facial nerve; and that, because plaintiff's seventh facial nerve was located nearer the surface than in the normal case, he mistakenly identified the nerve as the mucosa lining. The record also contains medical testimony that the enlarging of the opening in order to identify the facial nerve is not a conclusive test; that the only sure method of identification is the cutting out of a piece of the tissue for examination by a pathologist, which is obviously impracticable as this would cause injury to the nerve.

This dispute in the medical testimony raised a factual question of negligence which was for the jury. The trial court properly refused to hold the defendant negligent as a matter of law and to submit the case to the jury on the issue of damages only.

The plaintiff assigns error to the failure of the trial court to give her proposed instruction No. 47:

"If you find that the defendant has failed to produce evidence or testimony which would properly be a part of his

case, and such evidence is within defendant's power to produce, and he fails to satisfactorily explain such non-production, then you are at liberty to infer that such unproduced evidence or testimony would be unfavorable to the defendant."

This assignment of error is without merit. The explanation of injury to Betty's facial nerve was produced by the defendant and is in the record. The instruction was properly refused.

■ The plaintiff assigns error to the failure of the trial court to grant her alternative motion for a new trial. She contends she was denied a fair trial because the defense counsel, Alan Hallowell, had been appointed her guardian ad litem at the previous mental illness hearing and because evidence was there considered as to the cause of her mental condition which related to her operation. The plaintiff impugns no bad faith to Mr. Hallowell but contends there was a conflict of interest to her prejudice in the presentation of the evidence on the issues raised in the instant case. Assuming the plaintiff is correct, this conflict could only affect the issue of damages and would have no bearing upon the negligence of the defendant. Since the jury verdict was for the defendant it is inherent in the verdict that the jury did not reach the issue of damages and that, therefore, no prejudice could have resulted to Betty.

As another ground for a new trial, the plaintiff argues that defense counsel Ronald Moore committed prejudicial misconduct in suggesting to the jury that someone had purposely painted her eyebrows in such a manner as to feign or exaggerate the paralysis of her face. We agree that such a statement was improper and may have been prejudicial to the consideration of the issue of damages by the jury. However, we cannot see any prejudice resulting to the plaintiff since this issue was not reached by the jury.

■ As further ground for a new trial, the plaintiff cites the refusal of the trial court to permit the plaintiff to read to the jury the defendant's deposition, in which certain questions propounded to him were not answered. After the defendant had completed at length an explanation of his

failure to identify correctly the seventh facial nerve, the following questions, which the plaintiff contends should have been admitted, were asked:

(1) "Q All right, I take it apparently you weren't quite careful enough in this case?

(2) "Q Doctor, did you feel you were careful enough in this case?

(3) "Q Doctor did you form any feeling at or after the time of this injury to whether or not you had been as careful as you should have been?"

The defendant refused to answer the questions under advice of counsel. No request was made to the court at the time the deposition was taken to require the defendant to answer.

At the trial, the defendant's counsel offered to permit the plaintiff's counsel to read the questions to the jury provided he also read from the deposition that the refusal was by reason of advice of counsel. The trial court also offered the plaintiff the opportunity to reframe the questions and address them to the defendant.

We are satisfied that the first question in the deposition was argumentative and that the second and third questions were improper because they elicited the defendant's feelings rather than his professional opinion. Moreover, the plaintiff was not prejudiced in view of the qualifications contained in the defense counsel's objections and the alternative allowed by the trial court to permit plaintiff's counsel to reframe the questions.

The plaintiff contends the court's instruction No. 14 on res ipsa loquitur was incorrectly stated. The plaintiff argues the court should have held as a matter of law that the three elements of the doctrine existed:

"(1) that the agency or instrumentality which caused the injury was at the time of the injury within the exclusive control of the defendant, and (2) that the injury is one which does not ordinarily occur but for neglect of those having control of the agent which caused the injury, and (3) the injured person has no direct knowledge of the evidence which caused his injury."

The court instead submitted to the jury the question of whether these three elements had been established by the

preponderance of the evidence. It instructed the jury that, in the event it found they had been established, certain inferences were to be drawn therefrom.

■ We do not see how the plaintiff has been prejudiced by the giving of this instruction on res ipsa loquitur. In *Chase v. Beard,* 55 Wn. (2d) 58, 346 P. (2d) 315 (1959), we held there was no need to instruct on the doctrine, stating:

"In cases in which the so-called 'doctrine' is applicable, its primary purpose is to withstand the challenge of the defendant's motion for a nonsuit. It did so here. *There was no necessity for any instruction.* . . .
"  . . .
"There was no error in refusing the requested instruction because (1) as set forth above, the 'doctrine' requires no instruction, (2) all of the facts were before the jury (There was no room for an instruction on an inference from those facts.), and (3)  . . ." (Italics ours.)

The negligence of the defendant must be proved by the plaintiff. *Chase v. Beard, supra.* There was no necessity for an instruction on res ipsa loquitur in the instant case. The plaintiff cannot claim she was prejudiced since she obtained a beneficial instruction to which she was not entitled. The objection of the plaintiff on this ground is therefore without merit.

■ The plaintiff contends she was prejudiced by the court's failure to sustain her objection to the answering of a hypothetical question by an expert witness, Dr. DeWeese, for the reason that it was an ultimate question of fact to be determined by the jury. The question and answer were as follows:

"Q Now, Dr. DeWeese, from your training and experience will you state whether or not in your opinion a facial nerve injury occurs during the tympanoplasty surgery even when the surgeon follows the standard medical practice and uses due care? A Yes."

The question was proper since the testimony was proper rebuttal to the plaintiff's contention that the injury was one that does not ordinarily occur but for the negligence of those having control of the agent which caused the harm. The plaintiff's contention is without merit.

The plaintiff also contends the trial court erred in over-ruling her motion that the jury be instructed to disregard the following question and that the answer be stricken:

"Q Dr. DeWeese, have you injured the facial nerve? A Yes."

The plaintiff argues the question was immaterial and inflammatory. We disagree. The question is material as rebuttal evidence in the same respect as the previously discussed hypothetical question and answer. Further, we find no basis upon which to hold the question inflammatory.

Having considered all of the contentions raised by the plaintiff and finding no prejudicial error, the judgment is affirmed.

OTT, C. J., FINLEY, ROSELLINI, and HALE, JJ., concur.