166 So.2d 904 (1964)
Lyle RUSSELL, Appellant,
v.
Charlotte HARWICK and Earl Harwick, her husband, Appellees.
No. 63-567.
District Court of Appeal of Florida. Third District.
August 11, 1964.
Rehearing Denied September 21, 1964.
Dixon, DeJarnette, Bradford, Williams, McKay & Kimbrell and James A. Dixon, Jr., Miami, for appellant.
Orr & Kaplan, Miami, Morris Abram, New York City, for appellees.
Before BARKDULL, C.J., and CARROLL, J., and DuVAL, HARVIE, Associate Judge.
CARROLL, Judge.
The appellee Charlotte Harwick fell and broke her hip.[1] Following an operation *905 and treatment by the appellant Dr. Lyle Russell, an orthopedic surgeon, Mrs. Harwick sued Dr. Russell and others charging negligence and trespass to the person. Her husband, the appellee Earl Harwick joined in her suit claiming derivative damages. A jury trial resulted in a verdict against Dr. Russell in favor of Charlotte Harwick in the amount of $60,000 and in favor of her husband Earl Harwick in the sum of $40,000. Judgment was entered thereon and Dr. Russell has appealed.
The complaint alleged that Dr. Russell was negligent in failing to inform the plaintiffs as to the alternate methods of surgical treatment he contemplated, and in proceeding without the informed consent of the plaintiffs; that had they been informed of such alternative procedures they would not have consented to the procedure utilized; that there was negligence in selecting the surgical procedure employed and in subsequent treatment through failure to diagnose and treat an infection which developed. The plaintiffs claimed that the negligent acts had resulted in lasting injuries to Mrs. Harwick. The defendant Russell joined issue. A motion he filed for summary judgment was denied.
The appellant presents nine points. The first five deal with sufficiency of the evidence on the several issues. The record in this case is extensive. The case was elaborately tried. The several specifications of negligence and breach of duty gave rise to issues on which abundant but conflicting evidence was submitted by and on behalf of the parties. No useful purpose would be served by a detailed discussion of the extensive testimony presented.
Mrs. Harwick was treated by Dr. Harris, an internist and Dr. Russell the orthopedic surgeon. Dr. Harris was a friend of the plaintiffs and had rendered professional service to them in the past. They engaged him to take charge of the case. His training fitted him to supervise the medication, but not the surgical processes. There was an issue and conflicting evidence on whether the plaintiffs were informed as to the nature of the operative processes contemplated and recommended by the surgeon, and their risks, dangers, and outcome probabilities. A jury question was presented as to whether the consent given for surgery by Mr. Harwick was an informed consent.
The doctor attempted as a first process to reduce the fracture by manipulation to be secured with the use of a nail. Unable to obtain the proper positional result in that process, Dr. Russell proceeded with an alternative process in which he performed an operation of severing the head of the femur and substituting therefor a metal (Austin Moore) prosthesis. This operation amounted to major surgery, and one which was calculated to result in some change in the length of the leg. The plaintiffs stated that had they known this was the intended or contemplated procedure they would have insisted on an orthopedic consultation, and would not have been in favor of the process.
There was also an issue and conflicting evidence from which the jury could have found for or against the defendant doctor as to the need or propriety of the process undertaken in view of the lack of emergency and the circumstances of the injury as then present.
There was a further issue, with reference to an internal infection which developed at the location of the surgery, and which Mrs. Harwick suffered from in the weeks immediately following surgery. From the evidence the jury could have concluded that following the operation there were signs of internal infection which went unheeded and untreated for some two weeks, and that the infected area should have been recognized and treated by aspiration. The accident occurred January 11th. The operation took place January 13th. The signs of infection appeared some days thereafter. The first week in March Mrs. Harwick was taken to New York where another doctor operated and found the *906 severe infection at the operation site, and its result which included damage and loss of tissue in the area. The ultimate result was necessity to remove the prosthesis and leave the hip without any adequate connection. In view of those disclosures the jury, with the aid of medical opinion evidence presented, could have found negligence on that issue.
Basically, this appeal amounts to a contention of want of evidence or of sufficient evidence on the material issues. We find no such deficiency in the record, and our examination of the record leads to the conclusion that the verdict was justified and had adequate evidentiary support.
We have considered the remaining points raised by the appellant, one dealing with the matter of admission of certain evidence, one as to the refusal of the court to grant a mistrial for an incident which occurred during the trial, and two relating to the refusal to give certain requested charges, and we find no reversible error has been demonstrated.
Whereupon the judgment appealed from is affirmed.
Affirmed.
DuVAL, Associate Judge (dissenting).
I can not agree with the conclusions reached in the majority opinion.
The complaint filed by Mrs. Harwick contained three issues covered in three different counts. One alleging negligence or malpractice, a second alleging trespass to her person by performing an operation upon her without any consent, a third issue alleging trespass to her person because of operating without her informed consent. Each issue was a separate theory for recovery, each requiring separate proofs unrelated to each other. Motions for directed verdicts after the plaintiff's case and after all the evidence was in was made by the defendant and denied.
The lower court submitted all issues to the jury, after giving lengthy instructions relating to each of the issues relied upon by the plaintiff for recovery. The jury returned a general verdict for the plaintiffs.
In order to permit a general verdict to stand when separate and different counts and issues have been submitted to the jury there must be sufficient evidence presented to sustain a verdict on each of the separate issues presented to the jury. To instruct on an issue not supported by the evidence is fundamental error and is grounds for reversal.[1]
In a careful review of this record, I can not agree that there is any evidence upon which a verdict could be sustained under any of the issues submitted to the jury under the instructions of the trial court.
The diagnosis and treatment of Mrs. Harwick's condition was not within the common knowledge of laymen and expert medical testimony must be presented by the plaintiff to sustain the issue of negligence[2] attributed to Dr. Russell and the jury was so charged. There is not any material medical testimony in this record upon which the jury could have relied to find negligence, and a discussion of the testimony is essential.
Dr. Russell was personally retained by Mrs. Harwick on the evening of her accident for the purpose of caring for her condition. After examining the x-rays he informed her it would be necessary for him to operate in order to repair her hip, to which she consented.
Mrs. Harwick had sustained a complicated fracture of the neck of the femur with damage to the head. All the medical testimony *907 agreed there were two generally accepted procedures to repair such a break. One was to try and manually reduce the fracture and fasten it with a nail or pin. The other was to remove the head of the femur and substitute a metallic prosthesis. All medical witnesses testifying agreed that if a correct alignment could not be accomplished that nailing could not be used.
In this case Dr. Russell first attempted to manually reduce the fracture and failed. If he had succeeded he would have opened the hip, drilled a hole up through the femur into the head of the femur, inserted a pin, closed the incision completing the operation. After being unable to obtain a manual reduction of the fracture he proceeded with the alternative method of removing the head of the femur and replacing it with a metallic prosthesis.
There was a difference of opinion between the doctors testifying as to what action they would have taken after manual reduction failed, a failure quite common in this type of fracture. Several testified they would have cut open the hip capsule and attempted to reduce the fracture manually and if successful, drill and place a pin through the top of the head of the femur down into the femur. Others testified that they would have opened the capsule, but instead of attempting to drill and pin through the top of the head of the femur would remove the head and replace it with a metallic prosthesis, using the same procedure followed by Dr. Russell.
All the medical testimony recognized both alternative procedures of repair, after manual reduction failure, to be recognized and approved methods of treatment and would leave the procedure selected to the judgment of the individual doctor performing the operation. Each of the procedures described entailed complicated and major surgery.
The fact that certain physicians would have proceeded in a different manner than the defendant is not a basis for malpractice. The Supreme Court of Florida has held that the courts cannot hold a defendant in a malpractice suit to the theory of one physician to the exclusion of the contrary opinion by another physician, if the treatment used is approved by a respectable minority of the medical practice.[3] The treatment afforded by Dr. Russell was approved by the majority of physicians testifying in this case and was not disapproved by any.
The operative wound healed properly and without incident and did not, at any time, display redness, heat, swelling or drainage. However, subsequent to the operation Mrs. Harwick began to run a low grade fever, which was treated by Dr. Harris and as time went on by several other doctors, none of whom found any infection or indication of infection at the wound site but found her to be suffering from a low grade phlebitis or thrombophlebitis. (A type of internal infection.)
On February 28, 1959 (operation January 13, 1959) Dr. Phillip D. Wilson, Sr., a New York orthopedic specialist, examined Mrs. Harwick and stated that he felt she had thrombophlebitis with the possibility of a hip joint infection.
On March 2, 1959, Mrs. Harwick was flown to New York City, entered into a local hospital under the care of Dr. Wilson where she was treated for phlebitis for several days before Dr. Wilson aspirated her hip finding a small amount of staphylococcus. Upon this finding Dr. Wilson performed surgery and removed the prosthesis.
Dr. Wilson was a highly qualified and experienced orthopedic specialist and for a period of ten years served on the American Board of Orthopedic Surgeons and was President of the Board. He, as Mrs. Harwick's principal medical witness, testified as follows:
"Q. You are familiar with the hospital records, consultations and the patient yourself, *908 I will ask you this question: From your knowledge of the surgery performed upon this woman, your inspection of hospital records, and your own personal knowledge acquired during the course of your treatment of her, are you in a position to state that the treatment afforded Mrs. Harwick by the defendants in this case was below the standard of care applicable to doctors of similar training and experience that practice in the community of Dade County, Florida?
"A. As I understand the question, it is whether in the case of Mrs. Harwick I felt the treatment was below the standards referred to?
"Q. Yes, sir.
"A. I do not think it was.
"Q. With specific reference to the hip prosthesis that you observed in Mrs. Harwick did you find anything at all improper or beneath the accepted standards of medical care in the manner in which the prosthesis was placed or positioned in the site of the operation?
"A. No, I did not.
"Q. There are a number of devices, prosthetic devices, are there not, Doctor, for the treatment of the reduction of the fracture of the hip such as the type displayed by Mrs. Harwick's accident?
"A. Yes.
"Q. There are a number of different techniques which may be employed in the treatment of such a fracture; isn't that true?
"A. Yes.
"Q. With respect to the technique employed in Mrs. Harwick's case, was there anything in that technique that you found, from your knowledge of the patient, from the examination of the records, from your examination of the patient, to be below the accepted standards of medical practice and care and diligence in the treatment of the conditions of this sort in Dade County, Florida, or in any other community?
"A. The answer is no.
"Q. Isn't it true, Doctor, that the choice of the type of prosthesis depends to a great extent on the personal experience or preference of the doctor performing the surgery?
"A. There are many different type of appliances that can be used, yes, and the choice is a matter of the doctors own experience in judgment.
"Q. Do you find anything in this case to indicate that Dr. Russell exercised bad judgment or judgment that is beneath the accepted standards of medical care in Dade County, Florida, or any other community, in the method whereby the repair of the fractured hip was undertaken?
"A. No."
There was no medical testimony differing with the above testimony of Dr. Wilson. The only differing by any physicians of Dr. Russell's treatment was that he, as an individual, would have, after failing to manually reduce the fracture, opened the capsule and attempted to reduce the fracture by aligning and nailing from the top. The minority of doctors in this case, although differing as to their individual preference, would not testify nor even intimate that the method and treatment followed by Dr. Russell fell below the accepted standards of medical care. The majority of doctors testifying completely endorsed the procedures followed by Dr. Russell. This conflict of opinion will not sustain a verdict for malpractice.[4]
The majority opinion apparently base their case of negligence against Dr. Russell on the fact that several weeks later an infection was found in the operation area and that the jury could have found the infected area should have been recognized and treated by aspiration. Aspiration is not a *909 method of treatment, but is a diagnostic procedure where a needle is inserted into the area of suspected infection and an attempt made to draw out fluid for examination. The majority of doctors testified that aspiration could introduce infection and did not recommend aspiration except after all other diagnostic procedures had been exhausted. Only one doctor testified that he might have aspirated sooner than was done in this case. This difference of opinion will not support malpractice.[5]
The medical testimony was in agreement that in all operations performed there is a certain incidence of staphylococcus infections inherent in hospitals despite all the care that can be exercised and that the source of these infections can not be determined. None of the doctors attributed the occurrence of the infection to any lack of care by any of the defendants and each testified that such infections have occurred, with similar patients under their care, and the infection could not be blamed on the doctor performing the operation or the post-operative care.
For the jury to have found that Dr. Russell should have recognized the infected area sooner would again necessitate a foundation of medical testimony showing that Dr. Russell's diagnosis and treatment of the infection fell below the standard of care required by the medical profession. There was no such testimony.
First, the record clearly shows that Dr. Harris prescribed to and treated Mrs. Harwick for her subsequent infection. The jury found that he was not negligent in his treatment. However, if Dr. Russell was also responsible for this treatment, we find all of the medical testimony to be in agreement that the post-operative treatment of the patient was proper. Not one medical witness testified that they would have treated her differently except the doctor who stated he might have aspirated her hip sooner. However, he did not criticize anyone for not aspirating earlier. There is a complete lack of testimony for the jury to base a finding that the failure to recognize the area of infection as being in the hip and to aspirate sooner, under the circumstances, was an omission falling below the standard of care usually exercised by physicians in similar cases. In addition the testimony of the medical witnesses was that even if the area of infection in the hip had been discovered earlier the treatment prescribed would have been the same and the resulting operation and removal of the prosthesis or pin, if the pinning technique had been used, would have still been necessary. Under the circumstances of this case, the failure to diagnose the infection site earlier would not justify holding the surgeon liable for plaintiff's damage.[6]
Had the infection not occurred, all of the doctors were in agreement that the procedure taken by Dr. Russell would have produced a good result. The doctors were in further agreement that with the occurrence of the infection, the end result of the plaintiff's condition would have been the same regardless of the technique used. Thus, it is clear that the proximate cause of Mrs. Harwick's condition was the staphylococcus infection, which set in subsequent to surgery as a result of unknown causes not attributable to either of the defendants by any medical testimony.
There is no testimony in this record upon which the jury could have found Dr. Russell guilty of malpractice and it was error to instruct on and submit this issue to the jury when no such testimony was available to support this issue.[7]
Mrs. Harwick's second issue was alleged trespass to her person by not obtaining her consent to operate and claimed both compensatory and punitive damages.
*910 The distinction between an action for malpractice and an action for trespass to the person is that trespass to the person is an intentional act which is unlawful, while malpractice arises on account of negligence. To sustain a verdict based on an issue of trespass to the person there must be some competent evidence presented to the jury that Dr. Russell performed an operation on Mrs. Harwick without her express or implied consent, or in a manner contrary to her expressed instructions.[8]
The plaintiff, Mrs. Harwick, readily admits that Dr. Russell was retained at her request to take care of her condition. She readily admits that he advised her that she had a broken hip and he would have to operate on her hip to repair it. Mrs. Harwick testified that she relied upon Dr. Russell to do whatever could be done to relieve her suffering and that she did not presume to tell Dr. Russell how he should operate or what type of operation he should do and that she consented to the operation to repair her hip without question, protest or inquiry. In addition, Mr. Harwick executed, the day before the operation, a standard form of consent authorizing Dr. Russell to perform any operation upon Mrs. Harwick that he might deem advisable in her best interest.
There is no evidence in the record upon which the jury could have based liability on a finding that Dr. Russell committed an intentional act, which was unlawful, without Mrs. Harwick's expressed or implied consent or contrary to her express instructions.
It was error for the trial court to instruct on and permit this issue to be considered by the jury, when there was no material evidence in the record to support such an issue.[9]
Mrs. Harwick's third count alleged that the defendants were liable on a theory of trespass to the person for the reason that in adopting the surgical procedure utilized they failed to inform the plaintiff of the alternative procedures available and the potential consequences involved in the repair of the hip operation.
Liability for failure to fully inform a patient as to all the alternative procedures available and the potential consequences in an operation is relatively new in Florida. The first case appears to be Bowers v. von Storch, Fla.App. 1963, 159 So.2d 888. The theory of liability under this issue is not that the surgeon operated without the patient's consent, but that the consent was ineffectual because he failed to inform the patient sufficiently for the patient to determine whether or not he desired to proceed with the operation.
In the von Storch case the doctor suggested an exploratory type of surgical procedure on a nine year old boy which was known to be dangerous, possibly causing death or paralysis, while at the same time there was available an alternative procedure not requiring any surgery at all. At the time of the doctor's recommendation there was no immediate requirement of any medical procedure. The doctor obtained the parents consent and the operative procedure was performed, resulting in the child being paralyzed. This court properly held that it was a jury question, based on conflicts in the testimony, as to whether or not the parents had been informed of the dangers involved and the non-operative alternative procedure available so that they could intelligently consent or not consent to the recommended procedure.
The present situation is far different than the von Storch case. In this case an operative procedure to repair plaintiff's hip was absolutely necessary and there was no alternative procedure of repair which would obviate the necessity of surgery. As previously described a manual reduction followed by opening the hip, drilling through the femur into the head of the femur and pinning with a Smith-Petersen pin (a pin *911 approximately 1/4" by 4" in length) is usually the first method of repair attempted. Upon failing to manually reduce the fracture it becomes necessary to open the capsule of the hip, containing the severed head of the femur and attempt to align the exposed head with the femur; drill downward through the head into the femur and insert the same type of pin or open the capsule, remove the severed head and replace the head with a metallic prosthesis. To repair the hip in either of the methods described requires major surgery and the procedure of removing the head of the femur and replacing it with a metallic prosthesis is no more and probably less severe than an attempted open reduction, drilling and nailing from the top. The reason the majority of doctors testifying favored the procedure adopted by Dr. Russell was they felt the chances of a successful operation to be much greater by replacing the severed head with a metallic prosthesis than by drilling through the head from the top and pinning. The latter procedure often failed necessitating a subsequent operation to remove the head and replacing it with a metallic prosthesis.
The question is whether or not Dr. Russell was legally required, under the circumstances of this case, to detail to Mrs. Harwick all of the procedures involved and did such a failure cause him to be liable under the theory of operating without the informed consent of the patient.
The basis of lack of informed consent in the von Storch case was failure to inform the parents of the non-operative procedures available so they could make an intelligent choice of whether or not to consent to an operation which may not have been necessary and to select the non-operative procedure.
This is not a case where the doctor misrepresented any material facts or used false misrepresentation in an attempt to gain the consent of his patient to operate.
In reviewing this record it is found that in addition to the alternative methods of repair discussed, there were other recognized and acceptable methods as well as a great number of individual techniques used in the performance of these operative procedures. In addition, the record discloses that there are many different types of nails or pins used and a number of different metallic prothesis available (at least thirty) for use. Would it, in order to have the informed consent of the patient, have been necessary to detail each of the many methods, techniques and appliances which could be used? Would such information assist a patient in making an intelligent choice? I think not.
In 41 Am.Jur. 221, Physicians and Surgeons, it is stated:
"Implied Consent  The general rule recognizes that express consent is not always essential, but that in some circumstances it may be implied or presumed. Thus, a patient who voluntarily consults a surgeon and voluntarily submits himself for treatment, relying entirely upon the surgeon's skill and care to decide for him what shall be done, gives a general consent, by implication at least, to such operation as may, in the surgeon's skill and professional judgment be reasonably necessary."
In this case Mrs. Harwick personally retained Dr. Russell's services for the purpose of repairing her hip. Dr. Russell advised her of the necessity to operate in order to accomplish her wishes. She was advised of the necessity of the operation thirty-six (36) hours prior to the surgery. During the elapsed time she spoke with Dr. Harris; she had her husband by her side for most of the day; she was alert and knew what the situation was. She testified that she relied on Dr. Russell to do whatever was necessary to relieve her condition. She did not request him or anyone to advise her of what specific method of repair was going to be attempted. Mrs. Harwick was not limited in any way in making inquiry concerning the details of the surgery. It was her prerogative to rely on the professional *912 judgment of the Defendant without making further inquiry,[10] which she did.
There were no cases submitted in briefs nor any found by independent research which have ever held or considered holding a physician liable for damages on the theory of, lack of informed consent, based on comparable facts as found in this record. To do so now will open the door for every patient who becomes unhappy with his physician's treatment or operation, through no fault of the physician, to sue on a claim admitting that he consented to the treatment, but would not have if the physician had described in detail the entire technique, each alternative technique or procedure and each possible result from each technique and method available for the treatment or operation.
There are no cases, that I have been able to find, which require a physician having consent, not gained by misrepresentation, to describe to his patient each technique or procedure available before proceeding with a required and necessary operation. If a patient must have an operation, it is not required that a physician describe all of the gory details and further disturb the patient. The patient in most cases has no desires to have the physician describe all of the details. However, if the patient wishes to have such a description, it would be his duty to inquire and the physician's duty to give reasonable and prudent answers.
The issue of informed consent should not have been submitted to the jury.
The cause of plaintiff's unfortunate condition was the result of an infection inherent in all surgery and not one peculiar to the type of surgery performed by Dr. Russell and one which could not be attributed, from the testimony in this record, to any lack of care by the defendant. Such an infection is not actionable.[11]
It is apparent that the verdict herein was returned on a basis of sympathy, prejudice, speculation or guesswork and not as a result of any material testimony upon which a verdict under any of the issues submitted to the jury would be sustained.
I would reverse.
NOTES
[1] The injury was a transverse subcapital fracture of the femur.
[1] Thomason v. Miami Transit Company, Fla. 1958, 100 So.2d 620; Gordon v. Cozart, Fla.App. 1959, 110 So.2d 75; Kimbro v. Metropolitan Life Ins. Company, Fla.App. 1959, 112 So.2d 274; Liefer v. Walton, Fla.App. 1962, 140 So.2d 350.
[2] Bir v. Foster, Fla.App. 1960, 123 So.2d 279; Atkins v. Humes, Fla. 1959, 110 So.2d 663; Bowles v. Bourdon, 1949, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R. 2d 1, 31(5).
[3] Baldor v. Rogers, Fla. 1954, 31 So.2d 658, 55 A.L.R.2d 453.
[4] Supra, Note 3.
[5] Id.
[6] Bir v. Foster, Fla.App. 1960, 123 So.2d 279; Bourgeois v. Dade County, Fla. 1957, 99 So.2d 575, 72 A.L.R.2d 391; Hill v. Boughton, Fla. 1941, 146 Fla. 505, 1 So.2d 610; 134 A.L.R. 678; 25 Fla. Jur., 162-163, Physicians and Surgeons.
[7] Supra, Note 1.
[8] Chambers v. Nottebaum, Fla.App. 1957, 96 So.2d 716.
[9] Supra, Note 1.
[10] Crippen v. Pulliam, 1963, 61 Wash.2d 725, 380 P.2d 475.
[11] Roberts v. Young, 1963, 369 Mich. 133, 119 N.W.2d 627.