[No. 38876.   Department Two.   February 8, 1968.]

FIDELITY AND CASUALTY COMPANY OF NEW YORK, *Respondent and Cross-appellant*, v. HALIBUT PRODUCERS COOPERATIVE, *Appellant*.*

*Bogle, Gates, Dobrin, Wakefield & Long, M. Bayard Crutcher*, and *Yancey Reser*, for appellant.

*Karr, Tuttle, Campbell, Koch & Campbell, Craig P. Campbell*, and *Floyd L. Newland*, for respondent and cross-appellant.

EVANS, J.†—The defendant, Halibut Producers Cooperative, herein referred to as Halibut Producers, appeals from a judgment entered upon the verdict of a jury denying coverage under an insurance policy issued by the plaintiff, Fidelity and Casualty Company of New York.

On Good Friday, March 27, 1964, an earthquake struck Seward, Alaska, at 5:36 p.m. This earthquake was rated as one of the "great earthquakes." It had a Richter magnitude of 8.4 to 8.6 and released 400 to 500 times the energy of the Seattle earthquakes of 1949 and 1960. It was of far greater magnitude than the San Francisco earthquake of 1906. The shaking lasted approximately 4 minutes and caused

*Reported in 437 P.2d 182.

†Judge Evans is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

massive submarine slides of earth along the shores of Resurrection Bay on Seward's waterfront. There is no evidence in the record to establish where the slides started, or what their sequence was. Seward was in the maximum damage area, and in this area the slides began within about half a minute after the quake came, and generated seismic waves of tremendous size and speed.

The plant of Halibut Producers stood partly on shore and partly on a dock on the Seward waterfront. This plant received, processed, froze, and stored halibut, salmon, and shrimp, and was commonly known as the "San Juan Dock." The principal machines used in the operation of this plant were in a building with a concrete foundation on solid ground. The plant was annihilated during or just after the earthquake, and its site is now approximately 40 feet under water. The new shoreline is approximately 300 feet from the old one. Heavy equipment from the plant was found scattered both inland above the new shoreline and three quarters of a mile distant in the water near the new shoreline.

This case arose out of claims made by Halibut Producers under its boiler and machinery insurance policy issued by the Fidelity and Casualty Company of New York, and was brought to issue by an action commenced by the respondent insurance company to obtain a judgment declaring that it was not obligated to pay for the losses. Halibut Producers counterclaimed for its losses alleged to have been suffered by reason of an accident insured under the policy.

The policy defines "accident" as follows:

> "Accident" shall mean a sudden and accidental breakdown of the Object, or a part thereof, which manifests itself at the time of its occurrence by physical damage to the Object that necessitates repair or replacement of the Object or part thereof; but Accident shall not mean
>
>     . . . .
>
>     (e) the breakdown of any structure or foundation supporting the Object or any part thereof; . . . .

The "objects" referred to are certain designated pieces of equipment installed on the San Juan Dock and used in the

operation of appellant's business. These insured objects, which were destroyed by the earthquake, are the subject of this lawsuit.

The insurance company claimed noncoverage upon two grounds. First, it was its contention that the damage to the insured equipment was not an "accidental breakdown" of the machinery and equipment as that term is used in the policy, and that the court should so rule as a matter of law. This the court refused to do. Respondent cross-appeals from this ruling. Second, it was respondent's contention that, if the San Juan Dock collapsed before the seismic wave struck, the loss resulted from a "breakdown of the structure or foundation supporting the objects," and, therefore, fell within the exclusionary clause of subparagraph (e), above quoted.

It was the contention of Halibut Producers that if the earthquake was the proximate cause of the loss, there would be coverage under the terms of the policy. Since it was conceded by respondent that the earthquake was, in terms of traditional tort thinking, the proximate cause of the loss, this contention did not raise any issue of fact, and, if sustained, would have allowed recovery as a matter of law. This the court refused to do, because of the holding of *Bruener v. Twin City Fire Ins. Co.*, 37 Wn.2d 181, 222 P.2d 833, 23 A.L.R.2d 385 (1950). *Bruener* holds in effect that in insurance cases of this type the issue of "cause of damages" is limited to the last direct cause of damage, and that the rule of proximate cause in actions for torts has no application.

Accordingly, the court presented to the jury the factual issue of what the last direct cause of damage was. Instruction No. 3, to which no exception was taken, provides as follows:

> The court has ruled that as a matter of law, if the damage to the "objects" belonging to Halibut Producers, and insured by The Fidelity & Casualty Company of New York, was caused by a seismic wave and if that damage occurred prior to the breakdown of any structure or foundation supporting the "objects," or any part thereof, such an occurrence would have constituted an "acciden-

tal breakdown" within the meaning of the policy, and the losses sustained by Halibut Producers would be covered by the insurance policy in question.

The issue to be determined by you in this case is: Were the "objects" damaged by a seismic wave prior to or concurrently with the breakdown of any structure or foundation supporting the "objects"?

If your answer to that question is "no," you shall return a verdict for The Fidelity & Casualty Company. If your answer is "yes," you shall return a verdict for Halibut Producers.

The jury, by its verdict, found that the damage was caused by the earthslides before, not after, and not simultaneously with, a seismic wave.

Halibut Producers timely moved the court for judgment n.o.v. or, in the alternative, for a new trial. Both motions were denied, and judgment was entered upon the verdict of the jury declaring that the insurance policy did not provide coverage for the losses.

Appellant assigns as error the refusal of the court to grant Halibut Producers' motion for judgment notwithstanding the verdict of the jury on the grounds that there was neither evidence nor reasonable inferences therefrom to support the verdict of nonliability of the insurance company. With this, the court cannot agree. The witness Edmund Endresen, a police officer, was in a boathouse near the waterfront when the quake started. While the shaking progressed, he ran about 700 feet upland from the shore, stopped, and looked back in the direction of the San Juan Dock. He testified, in part, as follows:

Q. Now, again I want to go through the sequence because it is the sequence that we are very much concerned about. Taking from the point that you got up to the railroad tracks, I take it once you got up to the railroad tracks was the first time you looked back in the general direction of the Halibut Producers' dock? A. Correct. Q. That's correct? A. Right. Q. At that time was the ground shaking or not? A. Right. You could stand up and that was about it. Q. What did you observe about the dock at that stage of the game? A. Well, I observed, noticed that the buildings were moving. Q. When you say "the buildings", specifically what are you talking about, the dock?

A. The whole thing, all the way from where I was at and all the way down was sliding. Q. Now, part of this dock I understand was built on pilings, and part of it was built right on the land? A. Right. Q. Is the part that was on the land involved in this movement at all? A. Yes, all of it. Q. And so just describe—it was moving at that point, is that what you are saying? A. That's right. Q. And moving in what direction? A. Moving east which is moving right off into the bay, into Resurrection Bay. Q. Did you notice at the time anything unusual about the water itself? A. No I didn't particularly pay any attention, no.

Mr. William Shannon, a consulting engineer, and soil expert, whose firm was assigned by the Army Corps of Engineers to conduct an investigation of the landslides which resulted from the earthquake, concluded that the earthslide caused the water disturbance that appellants contend destroyed the San Juan Dock, and, accordingly, the jury was justified in believing the earthslide preceded the wave:

Q. Could you tell us what the cause would have been? A. The boil would be a manifestation of the flow slide which occurred off the land. Q. Can you tell us how that would have worked? A. If we can visualize the ground sliding from the Seward waterfront into deep water, this would create a wave which would build up on the water surface and create the boils that were observed by a number of people in Seward. Q. What can you tell us about the shoreline as it exists now in this area? That is, from the Standard Oil docks north toward the head of Resurrection Bay. A. The shoreline has receded from two to 400 feet over what it was previously. The slope of the beach and the slope of the ground below the beach is parallel with the original slope, so it is a slide really of earth that has slid off and the present slopes are very similar to the slopes that existed prior to the earthquake or prior to the slide. There is a distance of land back of the present shoreline up to 400 feet in width which was in a state of incipient soil failure at the time these incidents occurred. Had the earthquake continued longer, it is my opinion this also would have slid into Resurrection Bay.

Mr. Shannon also testified that the earthslide started very shortly, "perhaps some 30 seconds," after the start of

the strong earth movement. Again Mr. Shannon gave as his opinion:

A. The wave would be the product of the landslide, in my opinion, and therefore if the wave was observed coming at the shore at this time, then the landslide must have already occurred. Therefore at that time the Halibut Producers dock should have been in the water.

On the other hand, the plant manager for Halibut Producers testified that he saw the San Juan Dock standing many seconds after the quake started, at the same time that he took a picture of the incoming wave. Also, Dr. Robert Dean, a wave expert, testified that there was a high degree of probability that the San Juan Dock was still standing when it was struck by the seismic wave. He saw no other way in which the debris, and especially a particular pump which weighed 250 pounds, could have been thrown 100 yards inland.

Thus there was evidence, as well as inferences from that evidence, sufficient to support the contention of either the respondent or the appellant. The jury chose to accept the testimony of the witnesses supporting the contention of respondent. The court cannot disturb this finding.

The appellant also assigns as error the court's giving of instruction No. 3, to which it did not except at the time of trial. Appellant recognizes the necessity for excepting to an instruction before it may be questioned on appeal, but argues that a sufficient exception cannot be taken to an instruction which correctly states the case law of Washington but the validity of which the appellant attacks. No authority is cited in support of this contention.

The record discloses that, at a conference held in chambers to discuss instructions, the court indicated agreement with counsel for appellant that the *Bruener* case, *supra*, was incorrect, and expressed a willingness to rule accordingly. Counsel for respondent informed the court that if it were to hold that the test for liability under the policy in question is proximate cause, a verdict for Halibut Producers should be directed, as such a determination would establish a clear issue for appeal. By not excepting to instruc-

tion No. 3, appellant made a choice to proceed to the jury on the contested fact issues rather than risk a reversal on appeal on an issue which placed upon appellant the burden of convincing this court that the *Bruener* decision should be overruled. While that appears to have been a reasonable choice to make at the time, it, nevertheless, precludes the appellant, having lost on one issue, from trying out a new issue on appeal.

In *Rank v. Alaska S.S. Co.*, 45 Wn.2d 337, 339, 274 P.2d 583 (1954), the appellant failed to make an exception which would properly apprise the court of its position, and the Supreme Court refused to consider the appellant's contention on appeal. The court set out the reasons for requiring a proper exception:

> It is perhaps proper to restate from time to time the purpose of the rule, which is to put upon counsel in general and those for appellants in particular, the duty to use their best efforts to keep a trial free from error. To this end they should assist the trial court by giving an adequate statement of their position upon all matters upon which they ask a ruling by the trial court. If a trial court then erroneously rejects their contentions, they may have a just grievance for which an appeal is the only remedy. An appeal, however, is not a device for trying out new theories or improving on the trial below.

An issue very similar to that raised by appellant was dealt with in *Unemployment Compensation Dep't v. Hunt*, 17 Wn.2d 228, 135 P.2d 89 (1943). In that case the question whether a statute was constitutional or not was raised for the first time on appeal. The court held:

> In his brief on appeal to this court, however, appellant departs from the original questions and, for the first time, makes an attack upon the general intelligibility and constitutionality of the unemployment compensation act.
>
> . . .
>
> . . . .
>
> We have many times held that questions which are not raised in any manner before the trial court will not be considered on appeal. [Citing cases.] This general rule is, likewise, ordinarily applicable to defenses and objections based on constitutional grounds.

The rule of the *Hunt* case, *supra*, was again applied in *Long v. Odell*, 60 Wn.2d 151, 372 P.2d 548 (1962).

Since the appellant did not except to what it now claims to be an erroneous statement of the law, it has invited any resulting error. As stated in *Graham v. Graham*, 41 Wn.2d 845, 851, 252 P.2d 313 (1953):

> But we believe a sound analogy can be drawn from the doctrine of invited error which arises as one phase of estoppel or waiver of a right to take a position inconsistent with that initially taken. . . .
>
> "The rule is well settled that a party cannot successfully complain of error for which he is himself responsible or of rulings which he has invited the trial court to make."

Appellant having taken no exception to the trial court's instruction No. 3, that instruction became the law of the case. *Seattle v. Harclaon,* 56 Wn.2d 596, 354 P.2d 928 (1960). See, also, *Anderson v. Blossom,* 63 Wn.2d 330, 387 P.2d 507 (1963); *Wright v. Kennewick,* 62 Wn.2d 163, 381 P.2d 620 (1963); *Crippen v. Pulliam,* 61 Wn.2d 725, 380 P.2d 475 (1963).

The judgment of the trial court is affirmed.

FINLEY, C. J., HILL, HUNTER, and HAMILTON, JJ., concur.