## TERESA L. HOLLOWAY *v.* RICHARD V. HAUVER ET AL.

[No. 394, September Term, 1974.]

*Decided August 7, 1974.*

The cause was argued before ORTH, C. J., and THOMPSON and LOWE, JJ.

*Elwood E. Hauver*, with whom was *John B. Wolfkill* on the brief, for appellant.

*Kenneth J. Mackley*, with whom were *Mackley, Gilbert & France* on the brief, for appellees.

ORTH, C. J., delivered the opinion of the Court.

On 30 May 1973 TERESA L. HOLLOWAY, appellant, instituted a tort action in the Circuit Court for Washington County against RICHARD V. HAUVER, M.D. and HAGERSTOWN SURGICAL CLINIC, Drs. CRAIG and MARSH, P.A., appellees. The declaration demanded judgment against appellees in the sum of $250,000 for injuries suffered by appellant caused by the negligence of appellees. It alleged:

"For that on or about October 23, 1971, the Plaintiff was a patient of the Defendants, licensed medical doctors in the State of Maryland, and the Plaintiff also was a patient admitted to the Washington County Hospital, in Hagerstown, Maryland, and while in the operating room of said hospital, under the care of the Defendants, the Plaintiff sustained first, second and third degree burns on her body when the merthiolate and alcohol, with which the Plaintiff has been prepared, was ignited by the negligent use of a hot cautery, which resulted in a flash blaze, said blaze and injuries being caused by the negligence and carelessness of the Defendants and by the failure of the Defendants to exercise the standard care to which the Plaintiff was entitled under the circumstances, and as a proximate result of the injuries aforesaid, the Plaintiff sustained serious,

painful, disabling and permanent injuries to body and mind, that she has in the past and will in the future incur necessary medical, hospital expenses and related expenses, the exact amount of which is not wholly ascertainable at this time. As a further and proximate result of the Defendants negligence aforesaid, she has in the past and will in the future suffer with pain and mental anguish, has in the past and will in the future be unable to engage in her every day activities and functions as before the accident and was in the past and will in the future be compelled to lose time from her employment and the income therefrom, the full extent of which is not wholly determinable at this time."

Appellant prayed a trial by jury. Appellees filed a general issue plea on 19 June 1973. On 14 August, upon suggestion for removal, Md. Rule 542, the case was transferred to the Circuit Court for Allegany County. On 15 November trial was had before a jury. At the close of the evidence offered by appellant, appellees moved for a directed verdict in their favor. The motion was granted. Appellant noted an appeal.

When the record came before us we noted that no judgment had been entered. We dismissed the appeal and remanded the case for the entry of a judgment in accord with the verdict directed. We said: "The case was fully briefed and argued before us on the merits. If, upon the entry of a judgment below, a timely appeal is noted, we shall be favorably disposed, upon request of appellant and appellees, to accept the briefs previously filed, and consider the arguments as previously made, so that the appeal may be determined forthwith with the least possible additional expense." *Holloway v. Hauver*, No. 927, September Term, 1973, unreported, filed 20 June 1974. On 24 June judgment was entered in favor of appellees and against appellant. Appellant noted an appeal. Upon petition of the parties we issued an order that the appeal be submitted on the briefs previously filed and the arguments previously made.

*The Grant of a Directed Verdict*

There is only one question presented. As framed by appellant and concurred in by appellees, it is whether the trial judge properly granted appellees' motion for a directed verdict.

### The Evidence

We give a compendium of the evidence offered by appellant. There were admitted by agreement a copy of a summary of a report of The Washington County Hospital Association signed by Hauver with respect to appellant under her then name of Teresa Lynn Ridenour, and a summary of a similar report signed by R. S. Oakley, M.D. The former, dated 5 November 1971 and dictated 3 November 1971, begins: "This 27 year old female was admitted to the hospital on 10/31/71 for hymenotomy, complaining of redness and itching around the vulva and has been treated recently for vulvitis with some effect and was found to have almost completely intact hymen." Under the heading "COURSE", there is set out:

"On the day of admission, the patient had hymenotomy. This operation was complicated by burns to the buttocks resulting from a flash blaze started by the hot cautery as it was used to cut the hymen, the blaze being caused by ignition of the merthiolate containing alcohol with which the patient had been prepped. The blaze was immediately extinguished, and after the operation, Furacin dressings were applied to the burns, which consisted of two areas of burns, one on each buttock and each measuring about 5 inches square. The patient's hospitalization was for one week, and she was discharged 10/29/71 receiving daily dressings of Furacin to the burns. She is to be followed in the office."

The "FINAL DIAGNOSIS" was "INTACT HYMEN". "COMPLICATIONS" were stated to be "First and second

degree burns of buttocks." The report of Dr. Oakley, also dated 5 January 1972, contains the following:

"The patient was a 23 year old white female who underwent hymenotomy under general anesthesia on 10/21/71 and during the procedure encurred a slash burn which was caused by the cautery arch igniting the Merthiolate prep. As a consequence, the patient sustained a severe second degree burn of the posterior buttock area. Postoperatively the wounds were treated temporarily in the hospital and subsequent to this were managed as an outpatient. However, her wounds failed to heal and she continued to complain of persistent drainage and pain in the buttock area. She was subsequently then admitted to Washington County Hospital for further care to the burned areas." [1]

It discloses that she was again admitted to the hospital on 6 November 1971 and gradually improved under treatment. On 22 November, however, she underwent a skin graft operation because a significant percentage of the burned area "continued to manifest itself as third degree." She was discharged on the eighth postoperative day. The "Final Diagnosis" was "Second and third degree burns on the buttocks."

Appellant testified regarding the circumstances leading to the hymenotomy. With respect to the operation itself, she remembered only that she was given the anesthesia and woke up in the recovery room. "I remember Dr. Hauver walking up and telling me that I was going to have to be admitted, that there had been an accident. At this point, he didn't explain exactly what." Later Hauver talked to her in the presence of her parents. He said "Just that I had been burned. That there had been an accident, and that I had been burned." She was in the hospital from Saturday until Friday. The transcript reads:

---

1. Appellant in her testimony said she was 25 years of age.

In reading the summary to the jury, Dr. Oakley read "flash burn". It is patent that "slash" is a typographical error.

"Q. During that time, did Dr. Hauver ever explain to you what happened that caused your burns?

A. Not in detail.

Q. Did you ever receive any information from any other persons as to what happened or caused the burns?

A. No. Not until I read the report in your office that day, the hospital records. I must clear that. Just that there had been an accident, and that there was a fire of some sort or explosion. Actually I remember even asking a nurse. And, of course, I imagine she isn't authorized to talk about it, and she just said something, you know, that there had been a little explosion or fire under me or something. And that's all I knew."

Subsequently Hauver made arrangements for Dr. Oakley to treat her and withdrew from the case.[2] She told about being re-admitted to the hospital, the treatment given her and her ultimate discharge, what further treatment she underwent and how the injuries affected her course of life.

Dr. Richard Oakley, stipulated to be "a surgeon and competent as an expert to testify in medicine and particularly in the field of surgery", first saw appellant on 1 November 1971. "[S]he had suffered second, possibly deep second degree burns, and uncertainty as to whether they were indeed third degree burns. But there was at that time evidence of infection and involvement of the wound by bacteria process." His diagnosis when he saw her again on 4 November was second and third degree burns. He admitted her to the hospital and treated her there. He recounted the subsequent history of the case. With reference to the cause of the burns, he said that he had discussed the matter "in an informal fashion" with Hauver, that he had read a summary

2. Appellant explained: "I knew he was semi-retired. He explained that he had planned on retiring earlier, but he was holding off till he thought I was in better shape, you know, and he stayed on a few extra days and then he left, then turned me over to Dr. Oakley."

report filed by Hauver, and that he had also filed a summary report, which was a combination of appellant's history obtained by him "in conjunction with previous records that would be contained in the hospital chart." He read the summary aloud. He said that Merthiolate prep is an "alcohol preparation", and that it was inflammable. He had used the Bovie machine "very extensively". He described it as an electronic device "that works on an electromagnetic wave principle that produces waves that are manufactured by the machine to produce coagulation of tissues." It can be used to cauterize and "as with a scalpel to cut and cauterize simultaneously." The witness gave a "qualified yes" to the question "In your use of the Bovie machine, have you ever noticed that when you approach tissue with the scalpel and that the power is on that there will be an electric arc between the scalpel and the tissue? " Oakley identified a manual for the operation of a Bovie machine. He said that Merthiolate is commonly used with the electro-cautery machine. He was asked: "Within the standard of medical practice in Washington County, what precautions should be taken when using an electro-cautery machine and a Merthiolate prep which contains alcohol? " He replied: "I think the standard for Hagerstown would be the same as the standard for anywhere, would be incidentally unrelated to the use of the Bovie or not. It would be either allowing the Merthiolate to dry or drying it with a sterile towel." He was asked the purpose in allowing it to dry. "The purpose basically with the use of any alcohol prep in this fashion is so that there will not be any excessive irritation to the patient's skin because of the alcohol.* * * Secondarily, the chance that because it is a flammable liquid that there could be ignition of it."

Dr. Aubrey Haines, a plastic and reconstructive surgeon, testified that he was familiar with the Bovie electro-surgical unit. He explained how it is used:

"Well the machine is usually on a stand in close proximity to the operating table. There is a power cord that runs from some point in the machine to a plug in the wall. When the machine is turned on

> there are usually two wires leading out of the machine, one which goes to an active electrode and one which goes to a ground plate. The ground plate is usually placed under the patient at some convenient point where a wide surface area is in contact, and the machine is then operated by a foot pedal so that when the foot pedal is turned on current will flow from the active electrode to whatever part of the patient's body or to an instrument on this part of the patient's body to pass current through this area for the coagulation of tissues."

He was shown a document which he identified as a copy of an operator's reference manual for a model "CSV" Bovie machine. He had seen a similar manual at the Washington County Hospital.

Hauver was called by appellant. He gave his occupation as general surgeon, retired as of 1 January 1972. On 23 October 1971, he performed a hymenotomy on appellant. He "prepped" her with a Merthiolate material containing 50% alcohol. It was his decision to use it. He was aware that any 50% alcohol solution can be flammable under certain conditions, "when it's in direct contact with fire, either a spark or a lighted match or something." He used a Bovie machine for the operation. He described the procedure followed in the operation:

> "The patient is wheeled into the operating room on a wheeled stretcher and transferred over — well actually the patient transfers herself. She's not yet asleep. — onto the operating room table. And the anesthetist then administers the anesthesia. And after that has taken effect for the operation of the type we did, the patient after anesthesia is moved down on the table towards the foot of the table so that the buttocks will come to the point in the table where the lower part breaks down. The foot of the table breaks down on hinges. So that the buttocks are flush with the end of — that is down the end of the table.

And at that point if the anesthetist says it's all right we go ahead with the preparation, in this case tincture of Merthiolate solution as an antiseptic preparation of the skin and the area of the operative field. In this case the operative field consists of the external opening of the vagina. In this case it wasn't open. The vulva, external genitalia, the pubis, the insides of the thighs, and the area down by the rectum. Painted on with a sponge held in a forceps. And it's used quite liberally and with some slight scrubbing effect at times, particularly in the crevices of the skin and the folds of the thighs, and then it's allowed to dry.

Following this, the — a drape is placed over the patient. In this case the drape is a — it covers the legs, which I failed to mention before the preparation the patient's legs and thighs are placed in stirrups, so that the thighs are pretty much in an upright position. The legs are down this way in stirrups. There are metal stirrup holders on each side that hold the legs up. And there's a drape made to fit over both legs and cover the lower abdomen, the thighs, and it has a small rectangular opening in the center which exposes the operative field. In this case the opening of the vagina and an inch or two around the orifice of the vagina. All the skin is then, except for that, is covered. This cover lays against the skin around the orifice of the vagina.

Either then or before the drape is put on, usually the bladder is emptied with a catheter. And then in a case like this there is no nurse assistant. The surgeon hands the active electrode, the wire and electrode to a nurse who place it into the machine. And you make sure the sponge and everything else is ready on the table and you're ready for surgery.

\* \* \*

Then the machine ... One other I forgot to mention, the plate that Dr. Haines spoke of, the

ground plate, which is a metal plate about ten to fifteen inches or so, is laid under the buttocks. [Reference was made to photographs]

* * *

This is the plate at the bottom here, this light . . . It's a metal, thin metal steel plate I believe. And to the side of that you hook the wire which goes back to the machine which Dr. Haines spoke of. You have one wire going to the active electrode and one from that ground plate back to the machine to complete the cycle. That has been placed under before the drape has been put on.

Then you're ready if everything, the anesthesia and everything is all right you're ready to proceed with the surgery. In this case the active electrode was a very small thin blade which is used for cutting, not for coagulation but for cutting. And that's what we were doing in this case.

* * *

And you still haven't touched the foot pedal. The blade is placed where you want to use it to cut, which in this case was the small opening which was present in the hymen, which probably was half a centimeter in diameter, quarter of an inch or thereabout. Then it's laid there ready to cut. Then you touch the foot pedal and cut with it.

* * *

On this immediately upon touching the pedal and before I had cut probably not more than a quarter of an inch there was a puff of blue flame and smoke up from under the drapes, not in the operative field where I was cutting. And immediately, within two or three seconds, we put out that by just smothering it with the drapes which were already over it. The whole process took — I doubt if it could

possibly have taken more than five seconds to put it out.

* * *

Not immediately. We lifted the drapes up to inspect. And at that inspection there was definitely no evidence of any burn. So we proceeded with the rest of the operation, which took only — not more than a minute. Because you just make two cuts in it and then dilate the opening of the vagina with your fingers. That's the end of the procedure.

Following this, we took the drapes off. The only evidence of burn as the patient was in the stirrups on the table was a little small area of singed hair which we could smell. There was no visible evidence of burn with the patient in the stirrups.

We proceeded to take her out of the stirrups, put her flat on the table and move her on to the stretcher. And it was then and only then that we saw that she was burned on the buttocks on the surface where she was in contact with the plate."

The matter of the flame was pursued.

Q. You say that you saw a puff of smoke and a blue flame?

A. Very light blue flame. It was just a flash, puff, that's all.

Q. And is a light blue flame of intense heat?

A. No. I don't think so. There's no way of telling. I have since actually burned Merthiolate in a dish and it is not intense heat. Alcohol, as a matter of fact, burns at a fairly low temperature.

Q. You said that when the patient is prepped with Merthiolate and alcohol that it is then allowed to dry?

A. That's right.

Q. Why is it then allowed to dry?

A. Because of its flammability primarily. And to

have a dry field to work in. And this dryness of Merthiolate on the warm skin of the body is almost instantaneous. I mean you can paint it on and almost before you finish one place it's dry while you've gone to another. The drying effect of alcohol on a flat surface is very rapid."

Hauver offered "what I feel now happened":

"In the first place, at no time did I think that there was negligence or malpractice. This really . . . At the time it was our immediate concept, and I say right in my paper in my summary, that the — I forget what I said — flash blaze started by a hot cautery causing the burns. I think now, and I think I can say that it was not the flame at all, had no effect on the burns, but that the burn was from some malfunction of the plate beneath the body which allow either a short circuit or a static spark gap or something like that in an area far removed from the — relatively far removed from the operative field, which was up in the vagina fully six inches from the — six inches to eight inches from the table, the operating table.

I never saw the flame except as it came above the sheet. I don't know where it ignited. That was behind the drapes.

* * *

We didn't even suspect there was a malfunction. I reported it as due to the blaze at that time.

* * *

[Suspicion of a malfunction in the machine] came later. After I really got to thinking seriously and did a lot of investigation, looked into it thoroughly and found that that is probably the biggest accident or the most important accident that can happen with a Bovie unit or any electro-surgical unit.

* * *

That a malfunction at the point of the plate under the patient, either a short circuit some way or some malfunction which does not allow the electricity which enters the body through the needle that I'm using, goes through the body and it's not taken up by this ground plate. The ground plate ordinarily takes up this very concentrated, high frequency current over a big broad area so that by that time it is not hot. It's not a hot current like goes out of the needle but it's spread over a big surface and becomes a cool current."

He was asked if he made any adjustment to the machine after he saw the blue flame. He replied: "I didn't because there was no evidence of anything wrong. It cut perfectly." Hauver said that he had applied a "liberal amount" of Merthiolate with a sponge, using "a slight rubbing action to remove anything that may be on the surface of the skin." He was asked if it was not likely "to be puddling and run offs" of the liquid, and thought that "it couldn't puddle on the sheet. It would go through the sheet." He did not know if the machine had subsequently been inspected with respect to a malfunction. He was unable to give a yes or no answer to the question "If the preparation of Merthiolate and alcohol placed on Mrs. Holloway had not been allowed to dry before use of the electro-cautery, could that cautery have set the preparation, the alcohol afire? " He said:

"First of all, I've said that alcohol evaporates very fast on the surface of the body, particularly warm skin. There was ample time for it, up to five minutes in the preparation of the patient and setting things up and ready to do the surgery. Also, this preparation that we used was identical to all preparations in which I use tincture of Merthiolate for similar procedures for operations in or around the vagina for a full twenty years that we used the Merthiolate. I never once heard of any burn effect from any Merthiolate on any patient of mine which certainly considerably total well over a thousand

cases. And I never heard of any other surgeons in Hagerstown having that happen."

He attempted to reconcile the report made on 3 November 1971:

"That was made a couple days after the operation. It was an assumption that we made. We had two factors. We had a blaze and we had a burn. The natural assumption I think at that time without going into detail or anything was that the blaze caused the burn. I do not subscribe to that at this time."

He changed his mind when he "started looking up the facts about the situation and what could happen, where the breakdowns in machines are and what not." He did that "this past summer." It was after he was deposed on 19 July 1973 that he came to repudiate his report of 3 November 1971. "As a matter of fact when I gave the deposition I did not know at that time that I was being charged with negligence or malpractice. And it was after the second visit to the lawyer that I was fully explained. And that's when I really tried to get to the bottom of the thing. Did so very extensively." Hauver was shown the following paragraph from the Bovie machine operator's manual, and later read it to the jury:

"When an inflammable fluid, such as alcohol or ether, is used to cleanse the field preparatory to surgery, it is well to remember that there is a possibility of igniting any gas or residual liquid by a spark from the electrode. When inflammable fluids or solvents are used, allow sufficient time for complete evaporation and be sure that drapes, dressings, coverings, clothing, etc., surrounding the field are not saturated with the liquid."

He said he had knowledge of the facts therein contained — "I think this is information that any surgeon would know . . . I did. It's common knowledge." He thought very definitely that "the paragraph established a standard of care

that was practiced and in use in the operating room of the Washington County Hospital in October of 1971." He remembered talking to a member of appellant's family immediately after the operation but could not recall whether he told the person that the burns were entirely his fault. On cross-examination it was brought out that after the operation Hauver read an article entitled "Electro-Surgical Burn Injuries And Their Prevention" in reprint from the National Institutes of Health which indicated that it was a malfunction of the ground plate or a short circuit in the ground plate or its connections which are the most common source of accidents and burns in the use of the machine. But on re-direct it appeared that the article dealt with burns primarily from the ground plate. There was also testimony on cross-examination tending to show that adequate time had elapsed to permit the alcohol in the Merthiolate to evaporate before the actual surgical procedure was begun. Hauver estimated the time to be five minutes.[3] On re-direct examination reference was made to the deposition of Hauver. He was asked during the deposition proceedings: "Then the report says that the blaze was caused by ignition of the Merthiolate containing alcohol, and that ignition would have been caused by the hot cautery? " The answer in the deposition was "That's right." At the trial, Hauver explained: "That is what I felt at the time." He was asked: "And that's what you thought as of July 1973? " He replied: "At that time I had not gone into the investigation of the whole situation." There was a further question in the deposition: "And that report as made then was accurate and is accurate as of this time? " There was no answer to it, but Hauver did not know whether he had shaken his head yes. Photographs, in color, of the burned area, were received in evidence.

## The Ruling

In granting appellees' motion for a directed verdict, the

---

**3.** According to Hauver the anesthetic was effective for 15 minutes. The surgical procedure, the actual cutting, could be done in less than a minute.

trial court did not "see any evidence whatever of any lack of skill and care on the part of the doctor directly resulting in the injuries to the Plaintiff." It further found ". . . a total want or lack of any evidence produced of the degree of skill and care that is exercised in the area in October, 1971. But even assuming that from Dr. Hauver's testimony that by reason of his thirty-seven years and his statement as to what transpired in the operating room that that would support the first element of showing what the care, skill and diligence required may be, it still doesn't produce any evidence that the doctor did anything in this instance which departed from that requirement."

### The Law

The rules of the Maryland cases applicable to medical malpractice were reaffirmed in *Nolan v. Dillon*, 261 Md. 516, 533-534, in which the Court of Appeals used the language of *Lane v. Calvert*, 215 Md. 457 at 462-463, being of the opinion that it was nowhere better stated:

> "The rules of law applicable in this State to cases of alleged medical malpractice, . . . are well established. There is a presumption that the doctor has performed his medical duties with the requisite care and skill. . . . The burden of proof is on the plaintiff to show both a lack of the requisite skill or care on the part of the doctor and that such want of skill or care was a direct cause of the injury; and if proof of either of these elements is wanting the case is not a proper one for submission to the jury. . . . The rule as to the degree of skill required is stated in *Dashiell v. Griffith*, 84 Md. 363, 380, 35 A. 1094 [1896]: '* * * the amount of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by others in the profession generally.' This rule has since been followed consistently. . . .

> "It is well established by the case law in this State that the mere fact that an unsuccessful result follows medical treatment is not of itself evidence

of negligence. . . . Nor does the doctrine of *res ipsa loquitur* apply. . . ."

We do not view the evidence as did the court below. We think there was legally sufficient evidence of the standard of care in the area with regard to the use of the Bovie machine and inflammable liquids. Hauver admitted that the paragraph from the manual, read into evidence, established a standard of care that was practiced and used in the operating room of the Washington County Hospital in October 1971. With respect to the requisite skill and care on the part of Hauver, the trial court was bound to assume the truth of all credible evidence supporting appellant's contention and the reasonable inferences to be drawn from them. *Durante v. Braun,* 263 Md. 685. In other words, when the trial court was called upon by appellees' motion for a directed verdict to rule upon the legal sufficiency of the evidence to require submission to the jury of the issue of the requisite skill and care of Dr. Hauver, it had to assume the truth of all credible evidence on that issue and of all inferences fairly deducible therefrom, and consider them in the light most favorable to appellant as the party against whom the motion was made. It is only when such evidence and inferences lead to conclusions from which reasonable minds could not differ, that the issue is one of law for the court and not one of fact for the jury. *Burns v. Goynes,* 15 Md. App. 293; *Lauer v. Scott,* 12 Md. App. 555. See *Katz v. Holsinger,* 264 Md. 307.

The evidence adduced by the appellant relevant to Hauver's skill and care in his conduct of the operation on appellant was credible. We find clear that it and the inferences fairly deducible therefrom, considered in the light most favorable to appellant, lead to conclusions from which reasonable minds could differ. We need point only to the hospital report submitted by Hauver (the weight to be given his explanation of it was properly for the jury), the evidence that Merthiolate prep was 50% alcohol, and that it was "liberally" applied to appellant, the evidence concerning the operation of the Bovie machine, the caution in the operator's manual, and the location of the burns on appellant as shown

by the photographs and testimony. See *Thomas v. Corso,* 265 Md. 84. The short of it is that we believe that under the rule governing directed verdicts, the evidence and inferences therefrom which were before the court were sufficient to have the question of a lack of requisite skill and care on the part of the doctor and the question that such want of skill or care was a direct cause of the injury to appellant, submitted to the jury. It is our view that the court below erred in granting appellees' motion for a directed verdict. Cf. *Suburban Hospital Association, Inc., et al. v. Hadary,* 22 Md. App. 186; and *Raitt, et vir v. Johns Hopkins Hospital, et al.,* 22 Md. App. 196.

> *Judgment reversed; case remanded for a new trial; costs to be paid by appellees.*