KATIE SUE SARD ET VIR *v.* ERVING D. HARDY

[No. 853, September Term, 1975.]

*Decided December 21, 1976.*

218

The cause was argued before MORTON, POWERS and DAVIDSON, JJ.

*Lawrence P. Pinno, Jr.*, with whom were *Joseph F. Lentz, Jr.*, and *Lentz & Hooper* on the brief, for appellants.

*George J. Goldsborough, Jr.*, with whom were *Goldsborough, Franch & Collett*, on the brief, for appellee.

POWERS, J., delivered the opinion of the Court. DAVIDSON, J. dissents and filed a dissenting opinion at page 239 *infra.*

The parties in this appeal, Katie Sue Sard and her husband, David Penn Sard, Jr., appellants, and Erving D. Hardy, M.D., appellee, went to trial before a jury and Judge Harry E. Clark, Jr. in the Circuit Court for Talbot County, on an amended declaration containing eight causes of action asserted by Mrs. and Mr. Sard against Dr. Hardy.

Suit was filed on 29 August 1972. The amended declaration was filed on 1 February 1973. Trial was held on 26 and 27 March 1974. At the close of all of the evidence offered by the plaintiffs, the defendant filed a motion for a directed verdict. Maryland Rule 552. After hearing arguments, the court granted the motion. On 1 April 1974 the plaintiffs filed a motion for a new trial. That motion was heard by Judge Clark on 28 July 1975, and was overruled. Judgment absolute was entered. The plaintiffs appealed.

We shall discuss briefly the significant allegations

of the amended declaration, to aid in understanding the legal foundations upon which the several claims rest.

The first three causes of action are asserted only by Mrs. Sard. In the first she said that Dr. Hardy was a licensed physician, a specialist in obstetrics and gynecology, and in the performance of bilateral tubal ligation to prevent pregnancy; that in March 1968 she employed Dr. Hardy to treat her for the purpose of accomplishing sterilization; that she had undergone several difficult prior pregnancies, terminating in Caesarean sections, and Dr. Hardy recommended that she be sterilized; that on 26 March 1968 Dr. Hardy delivered her child by Caesarean section and attempted to perform a bilateral tubal ligation upon her, and represented to her that it would accomplish sterilization. She alleged that Dr. Hardy did not use the usual, ordinary, or accepted method of performing that operation or, in the alternative, that he was so negligent in performing the operation as to fail totally in accomplishing its purpose; and that in April 1970 she again became pregnant. The other allegations related primarily to damages.

In her second cause of action Mrs. Sard adopted the allegations of the first, except as to negligent performance of the operation, and alleged that Dr. Hardy negligently failed to inform her that the surgical procedure for sterilization was not absolute, and that the possibility did exist that she could thereafter become pregnant, so that she might declare her decision in accepting or rejecting the procedure.

The third cause of action differed only in that the negligence alleged was that Dr. Hardy advised her after the delivery and operation that she could engage in sexual intercourse with safety and could not become pregnant, and that he gave this advice without having performed suitable postoperative tests to ascertain the success or failure of the operation.

The fourth, fifth, and sixth causes of action, asserted by both plaintiffs, paralleled the first, second, and third, respectively, and differed only in that they claimed damages incurred jointly by both plaintiffs.

The seventh cause of action, by Mrs. Sard alone, alleged that Dr. Hardy expressly warranted the success of the operation. The eighth, brought by both plaintiffs, was based upon the same allegation of express warranty, and claimed joint damages.

Mrs. Sard's relevant medical history as disclosed by the record was that in December 1965, when she was eight months pregnant, she developed eclampsia and severe convulsions. An emergency Caesarean section was performed. The baby did not survive. She first saw Dr. Hardy, the defendant in this case, in October 1966, after she had become pregnant a second time. He rendered routine prenatal care, and on 4 March 1967 delivered a normal baby girl by Caesarean section in the hospital at Easton. There were no complications.

Dr. Hardy again saw Mrs. Sard when she came to him on 28 November 1967. She was five months pregnant. He rendered care through an uneventful prenatal course, culminating in the delivery of a normal baby girl on 26 March 1968 by Caesarean section, at The Memorial Hospital at Easton. At the same time Dr. Hardy performed upon Mrs. Sard an operative procedure described as a bilateral tubal ligation.

In June 1970 Mrs. Sard, suspecting that she was pregnant, consulted a different physician, who confirmed that she was. The time of conception was estimated to have been the middle of April 1970, slightly more than two years after the tubal ligation was performed. The child was born at the hospital in Cambridge in January 1971.

At the trial of the case Mr. and Mrs. Sard relied upon the testimony of four witnesses to support the issues of liability. The witnesses were Dr. Hardy, called by the plaintiffs as an adverse witness, Mr. Sard, Mrs. Sard, and Dr. Eldon L. Hawbaker, who had been in training as a resident in general surgery in the hospital in March 1968, and had assisted Dr. Hardy at the operation. Dr. Hawbaker was called by the defendant out of turn, by agreement, to testify that he had dictated the operative report, and that it was true, to the best of his knowledge. The record suggests that during cross

examination, the plaintiffs made him their witness for a limited purpose.

The issues, as they were pleaded and tried below, fell into four areas, which we summarize as follows:

1. That the doctor was negligent in the manner in which he performed the sterilization operation. (First and fourth causes of action.)

2. That the doctor was negligent in failing to inform his patient of facts material to her consent to the sterilization operation. (Second and fifth causes of action.)

3. That the doctor was negligent in failing to perform postoperative tests to ascertain the success or failure of the operation. (Third and sixth causes of action.)

4. That the doctor expressly warranted to his patient that the operation would accomplish sterilization. (Seventh and eighth causes of action.)

In argument to Judge Clark on the motion for a directed verdict, plaintiffs' counsel relied for evidence of negligent performance upon the eventual "failure" of the operation — recanalization of a fallopian tube. The trial judge rejected that argument, and granted the motion as to the first and fourth causes of action. The issue is not raised or argued in this appeal.

As to the alleged failure to make postoperative tests for success or failure, plaintiffs' counsel conceded below that there was no evidence to support that claim, and that the motion should be granted as to the third and sixth causes of action. It was. The issue is not raised or argued in this appeal.

Two issues are raised in this appeal as to the correctness of the directed verdict, and an error in ruling on evidence is asserted.

In their brief, appellants state the Questions Presented in this way:

I. Was it error for the trial court to direct a

verdict in favor of the Defendant, Dr. Ervin D. Hardy?

A. Was the plaintiff's evidence legally sufficient to sustain a finding by the jury that Dr. Hardy had failed to obtain an informed consent from Mr. and Mrs. Sard prior to the sterilization of Mrs. Sard?

II. Was it error for the trial court to refuse to allow Dr. Hawbaker, who had assisted Dr. Hardy in Mrs. Sard's sterilization, to testify as to the standard of care required of physicians and surgeons who performed sterilizations in Easton, Maryland in 1968.

III. Was it error for the trial court to hold that Dr. Hardy's express warranty of sterilization was unenforceable for lack of consideration.

## Consent to Operate

Generally, a physician has no right to operate upon the body of a patient without that patient's consent.[1] To do so has been treated historically by the courts as a battery, or assault and battery. As the Court of Appeals of New York, through Cardozo, J. said in *Schloendorff v. Society of New York Hospital*, 211 N. Y. 125, 105 N. E. 92 (1914):

"Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages."

In that case the testimony of the patient was that she had consented to an abdominal operation for the purpose of examination, but had notified the doctor that there must be no operation. The surgeon who operated removed a tumor. The Court held that the hospital was not liable for the

---

1. We are not dealing here with an emergency which requires prompt action, or with consent given by one person on behalf of another who is, at the time, incapable of making a decision.

physician's wrong, but said of it, " * * * the wrong complained of is not merely negligence. It is trespass."

The assault and battery theory has been widely applied, with some of the cases holding that an apparent consent which is not "informed" is no consent at all. In A. Holder, *Medical Malpractice Law*, 228-29 (1975), the author explains:

"There are two different legal theories to support actions by plaintiffs alleging lack of consent. The original theory on which this cause of action was predicated was that treatment to which the patient had not knowingly consented was a classic example of the tort of 'assault and battery.' This is still the case where the patient is in total ignorance of what is to be done."

* * *

"The other approach to this problem is to treat it as negligence and allege that a physician's failure to explain the consequences of treatment to which the patient has consented without understanding is negligence per se and a violation of the requisite standards of due care. In most cases in which the doctrine of informed consent arises, the patient is aware of the nature of the procedure which he is to undergo and has in fact signed a consent for it. What he does not understand is that there are some risks of permanent damage inherent in the procedure. Failure to have told him this means that the action is one in negligence.

"The practical difference between the two theories is that if assault and battery is alleged, no expert testimony is required to prove it. Lay witnesses are sufficient. On the other hand, in most, but not all, states, before a claim of medical negligence can go to the jury for determination, expert testimony to the fact that the reasonably careful physician would have explained the given risk is required."

An interesting observation of the change in the trend of judicial thinking is found in W. Prosser, *The Law of Torts* 165-66 (4th ed. 1971), which says:

> "A considerable number of late cases have involved the doctrine of 'informed consent,' which concerns the duty of the physician or surgeon to inform the patient of the risk which may be involved in treatment or surgery. The earliest cases treated this as a matter of vitiating the consent, so that there was liability for battery. Beginning with a decision in Kansas in 1960, it began to be recognized that this was really a matter of the standard of professional conduct, since there will be some patients to whom disclosure may be undesirable or even dangerous for success of the treatment or the patient's own welfare; and that what should be done is a matter for professional judgment in the light of the applicable medical standards. Accordingly, the prevailing view now is that the action, regardless of its form, is in reality one for negligence in failing to conform to the proper standard, to be determined on the basis of expert testimony as to what disclosure should be made. The factors to be considered by the physician or surgeon include the likelihood and seriousness of the bad result, the feasibility of alternative methods, the interest of the patient, knowledge of his past history, his emotional stability, the necessity of treatment, and the existence of an emergency."

Perhaps the most articulate and exhaustive judicial discussion of the "informed consent" principle is found in the case of *Cobbs v. Grant*, 8 Cal. 3d 229, 104 Cal. Rptr. 505, 502 P. 2d 1 (1972), written by Justice Mosk for the Supreme Court of California. The case had been submitted to a jury on a claim that the physician was negligent in undertaking and in performing an operation for a duodenal ulcer, and on a claim that the physician's failure to disclose the inherent

risks of the initial surgery vitiated the patient's consent to operate.

The patient's course following the surgery was complicated by three occurrences. He suffered internal bleeding which required an emergency operation for the removal of his spleen, because an artery at the hilum of the spleen had been severed during the operation. This was stated to be a risk inherent in the type of surgery performed. A month or two later the patient developed pains, which were caused by a developing gastric ulcer. The evolution of a new ulcer was stated to be another risk inherent in the surgery performed. A third operation, removal of one half of the patient's stomach, was performed to relieve the gastric ulcer. Still another hospitalization was required because of internal bleeding due to the premature absorption of a suture, another inherent risk. This condition abated without further surgery.

The California court held that there was not substantial evidence to support a jury verdict on the issue of liability for negligence in deciding to operate, or in performing the surgery, and reversed the judgment against the physician, for retrial. The court then discussed the question of informed consent. We shall quote portions of that discussion, generally omitting the numerous citations it contains. Justice Mosk wrote:

> "Where a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained, there is a clear case of battery.
>
>         * * *
>
> "However, when an undisclosed potential complication results, the occurrence of which was not an integral part of the treatment procedure but merely a known risk, the courts are divided on the issue of whether this should be deemed to be a battery or negligence.

* * *

"Although this is a close question, either prong of which is supportable by authority, the trend appears to be towards categorizing failure to obtain informed consent as negligence. That this result now appears with growing frequency is of more than academic interest; it reflects an appreciation of the several significant consequences of favoring negligence over a battery theory. As will be discussed *infra*, most jurisdictions have permitted a doctor in an informed consent action to interpose a defense that the disclosure he omitted to make was not required within his medical community. However, expert opinion as to community standard is not required in a battery count, in which the patient must merely prove failure to give informed consent and a mere touching absent consent.

* * *

"We agree with the majority trend. The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence.

"The facts of this case constitute a classic illustration of an action that sounds in negligence. Defendant performed the identical operation to which plaintiff had consented. The spleen injury, development of the gastric ulcer, gastrectomy and internal bleeding as a result of the premature

absorption of a suture, were all links in a chain of low probability events inherent in the initial operation.

* * *

"Defendant * * * points out that the majority of the California cases have measured the duty to disclose not in terms of an absolute, but as a duty to reveal such information as would be disclosed by a doctor in good standing within the medical community. * * * Moreover, with one state and one federal exception every jurisdiction that has considered this question has adopted the community standard as the applicable test. Defendant's second contention is that this near unanimity reflects strong policy reasons for vesting in the medical community the unquestioned discretion to determine if the withholding of information by a doctor from his patient is justified at the time the patient weighs the risks of the treatment against the risks of refusing treatment.

* * *

"Despite what defendant characterizes as the prevailing rule, it has never been unequivocally adopted by an authoritative source. Therefore we probe anew into the rationale which purportedly justifies, in accordance with medical rather than legal standards, the withholding of information from a patient.

"Preliminarily we employ several postulates. The first is that patients are generally persons unlearned in the medical sciences and therefore, except in rare cases, courts may safely assume the knowledge of patient and physician are not in parity. The second is that a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment. The third is that the patient's consent to treatment, to

be effective, must be an informed consent. And the fourth is that the patient, being unlearned in medical sciences, has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process, thus raising an obligation in the physician that transcends arms-length transactions.

"From the foregoing axiomatic ingredients emerges a necessity, and a resultant requirement, for divulgence by the physician to his patient of all information relevant to a meaningful decisional process. In many instances, to the physician, whose training and experience enable a self-satisfying evaluation, the particular treatment which should be undertaken may seem evident, but it is the prerogative of the patient, not the physician, to determine for himself the direction in which he believes his interests lie. To enable the patient to chart his course knowledgeably, reasonable familiarity with the therapeutic alternatives and their hazards becomes essential.

"Therefore, we hold, as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each.

* * *

"A medical doctor, being the expert, appreciates the risks inherent in the procedure he is prescribing, the risks of a decision not to undergo the treatment, and the probability of a successful outcome of the treatment. But once this information has been disclosed, that aspect of the doctor's expert function has been performed. The weighing of these risks against the individual subjective fears and hopes of the patient is not an expert skill. Such evaluation and decision is a nonmedical judgment reserved to the patient alone.

* * *

"The scope of the disclosure required of physicians defies simple definition. Some courts have spoken of 'full disclosure' * * * and others refer to 'full and complete' disclosure, * * * but such facile expressions obscure common practicalities. Two qualifications to a requirement of 'full disclosure' need little explication. First, the patient's interest in information does not extend to a lengthy polysyllabic discourse on all possible complications. A mini-course in medical science is not required; the patient is concerned with the risk of death or bodily harm, and problems of recuperation. Second, there is no physician's duty to discuss the relatively minor risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence.

* * *

"In sum, the patient's right of self-decision is the measure of the physician's duty to reveal. That right can be effectively exercised only if the patient possesses adequate information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever information is material to the decision. Thus the test for determining whether a potential peril must be divulged is its materiality to the patient's decision.

"We point out, for guidance on retrial, an additional problem which suggests itself. There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given. Here the record discloses no testimony that had plaintiff

been informed of the risks of surgery he would not have consented to the operation.

\* \* \*

"The patient-plaintiff may testify on this subject but the issue extends beyond his credibility. Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment. Thus an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils."

What the California court said in *Cobbs v. Grant, supra,* closely parallels much of what was said by Robinson, J. for the court in *Canterbury v. Spence,* 464 F. 2d 772 (D.C. Cir. 1972). In addition, however, it includes what we feel is a more illuminating discussion of whether the scope of the duty of disclosure is measured by lay standards or by medical standards. On this question there is a substantial division of authority.[2]

Although it seems to be the fact, as appellants state in their brief, that there is no Maryland authority ruling on

---

**2.** Some of the cases which have held that expert opinion evidence of the standard of care is required are Getchell v. Mansfield, 489 P. 2d 953 (Ore. 1971); Ohligschlager v. Proctor Community Hosp., 283 N.E.2d 86 (Ill. 1972); Trogun v. Fruchtman, 207 N.W.2d 297 (Wis. 1973); Downer v. Veilleux, 322 A. 2d 82 (Me. 1974); and Young v. Group Health Cooperative, 534 P. 2d 1349 (Wash. 1975).

Contrary holdings are found in Canterbury v. Spence, supra; Wilkinson v. Vesey, 295 A. 2d 676 (R.I. 1972); Congrove v. Holmes, 308 N.E.2d 765 (Ohio 1973); and Scaria v. St. Paul Fire and Marine Ins. Co., 227 N.W.2d 647 (Wis. 1975).

See also, Annotation, Necessity and Sufficiency of Expert Evidence to Establish Existence and Extent of Physician's Duty to Inform Patient of Risks of Proposed Treatment, 52 A.L.R. 3d 1084, and Harney, Medical Malpractice (1973) at 63.

informed consent, the principle was applied in *Kruszewski v. Holz*, 265 Md. 434, 290 A. 2d 534 (1972), apparently by common acquiescence of both parties, the trial court, and the Court of Appeals. One of the patient's allegations was that the doctor was negligent in failing to inform her adequately of the possible risks of and alternatives to the operation. Expert opinion evidence was received on the question of whether the standard of care required of a physician was satisfied when he merely informed his patient that a hysterectomy was major surgery and complications could arise. Questions presented to and decided by the Court of Appeals involved the proper wording of hypothetical questions, and the adequacy of a special issue submitted to the jury to present the question of whether the doctor deviated from the standard of care by not sufficiently informing the patient of the alternatives and risks involved in obtaining her consent to operate. The very existence, in the law of Maryland, of a duty to disclose, and the extent of such a duty, were not before the Court.

Upon our consideration of the leading recent cases and the texts, we embrace the principle of informed consent, and we hold that it should be applied by the courts of Maryland in appropriate cases where there is a claim of professional negligence in failing to meet a duty to disclose.

The duty is to make an adequate disclosure of substantial facts which would be material to the patient's decision. The trial court must decide as a matter of law, on the facts and circumstances of each case, whether the evidence is sufficient to support a finding by the jury that there has been a negligent failure to disclose such facts.

A subsidiary question, which also must be decided by the trial court as a matter of law, on the facts of each case, is whether the duty to disclose is to be determined by standards of the profession, thus requiring expert opinion evidence,[3] or may be determined by a jury without the aid of

---

**3.** When the standard of care rendered by other physicians is an issue, many of the cases and writers say that the evidence must relate to the same community, or locality. Maryland takes a broader view. In Shilkret v. Annapolis Emergency Hosp., 276 Md. 187, 349 A. 2d 245 (1975), the Court of Appeals held, without regard to a geographical medical community or

expert opinion. We do not agree that either rule could be applied in all cases.

We now examine the evidence in the case before us, so that we may determine whether there was any evidence tending to show a negligent failure by Dr. Hardy to disclose to Mrs. Sard any substantial fact which would have been material to her decision.

It is perfectly clear that Mrs. Sard consented to the performance upon her by Dr. Hardy of the surgical procedure medically described as bilateral tubal ligation — she so alleges in her declaration. She said that they discussed the fact that she did not want to have any more children, and he suggested birth control pills, an intrauterine device, or sterilization. She rejected the first two choices. He told her that he could sterilize her by tying her tubes, at the time of the Caesarean section delivery. As she put it, "I thought sterilize meant fix you so you can't have no more kids, so I took it." The doctor did not discuss with her the technique he was going to use to tie her tubes, or advise her that there were different methods of sterilization.

It is equally clear that the tubal ligation was to be performed at the same time as the delivery. A month or a couple of weeks before delivery Dr. Hardy had told her to go home and think about it, and let him know. She did, and told him, "I would rather be sterilized."

It is also clear that Mr. Sard was in no way involved in any of the discussions between Mrs. Sard and Dr. Hardy. Mr. Sard testified that the first time he ever saw Dr. Hardy to speak to was in June 1970, when he told Dr. Hardy that Mrs. Sard was pregnant again.

There was very little evidence concerning risks or hazards inherent in the sterilization operation recommended by Dr. Hardy. It seems logical that they would add little, if anything, to the risks and hazards inherent in the delivery of a child by Caesarean section. Whatever those added risks

locality, that, "a physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances." Id. at 200.

and hazards might have been, they were successfully avoided by Dr. Hardy, or by Providence, or both. None developed. To repeat what we quoted above from *Cobbs v. Grant, supra*:

"Two qualifications to a requirement of 'full disclosure' need little explication. First, the patient's interest in information does not extend to a lengthy polysyllabic discourse on all possible complications. A mini-course in medical science is not required; the patient is concerned with the risk of death or bodily harm, and problems of recuperation. Second, there is no physician's duty to discuss the relatively minor risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence."

There was no evidence that Mrs. Sard suffered any ill effects from the sterilization procedure, during her recuperation or at any later time. It would be safe to say that at no time did any physical manifestation make her aware that the tubal ligation had been performed.

Appellants do not complain that the performance of the tubal ligation brought any harm upon Mrs. Sard. They do not complain that the operation should not have been performed. They do not contend on appeal that the ultimate failure resulted from negligence by Dr. Hardy. Their sole complaint, stated narrowly but accurately, is that the operation failed to provide, permanently, the expected benefit.

That any medical or surgical therapy or procedure may fail to accomplish the desired, or even the reliably expected result, seems to be universally recognized, both in medicine and in law. That recognition is inherent in the statement for the Court of Appeals by Chief Judge Brune in *Lane v. Calvert*, 215 Md. 457, 138 A. 2d 902 (1958), at 462-63:

"It is well established by the case law in this State that the mere fact that an unsuccessful result

follows medical treatment is not of itself evidence of negligence."

It is reflected also in that Court's consistent rejection of the rationale of *res ipsa loquitur* in medical malpractice cases. *Lane v. Calvert, supra; Johns Hopkins Hospital v. Genda,* 255 Md. 616, 258 A. 2d 595 (1969), and cases cited therein.

The absence of negligence in spite of an unfavorable result is not in all circumstances the equivalent to the absence of negligence in failure to disclose risks and hazards to the patient. In an excellent discussion of informed consent the Supreme Court of Rhode Island said in *Wilkinson v. Vesey,* 295 A. 2d 676 (R.I. 1972):

> "Having established defendants' duty to disclose, we will now delineate the extent of the disclosure which should be made. Obviously there is no need to disclose risks that are likely to be known by the average patient or that are in fact known to the patient usually because of a past experience with the procedure in question. * * * It is not necessary that a physician tell the patient any and all of the possible risks and dangers of a proposed procedure. * * * As we noted earlier, materiality is to be the guide. It is our belief that, in due deference to the patient's right to self determination, a physician is bound to disclose all the known material risks peculiar to the proposed procedure. Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment." 295 A. 2d 689.

The evidence in this case shows that the physical harm to the patient was zero; that there was one chance in fifty [4]

---

[4] It was brought out in the plaintiffs' examination of Dr. Hardy that the technique he chose to employ in the tubal litigation at the time of a Caesarean section had, according to a study on the subject, a failure rate of one in fifty.

that the benefit would be zero, and forty-nine chances in fifty that the benefit would be all that the patient desired.

On that evidence we hold that a reasonable person, in Mrs. Sard's position, would attach no material significance to the risk of one chance in fifty that she would derive no benefit from the operation. It is significant, and by itself perhaps fatal to her claim, that she produced no evidence to show that she would have refused the operation if she had known [5] that there was a chance of failure.

Although the trial judge did not arrive at his ruling by

---

5. The parties, and the trial judge, placed more importance than we do upon an authorization form, signed by Mrs. Sard and Mr. Sard before the operation. It was requested of them by the hospital, not by Dr. Hardy. It said:

"*AUTHORIZATION FOR STERILIZATION*

Date 3-25-68

I/We do hereby request and authorize the Memorial Hospital and the doctors thereof to perform upon ___Mrs. Katie Sue___ Sard , an operation intended to effectuate sterilization.

I/We understand what is meant by sterilization and I/We understand that if this operation is successful, the above named patient will be unable in the future to produce children, but I/We understand that an operation intended to effect sterilization is not effective in all cases. I/We consider that this operation will be for the best interest and physical well being of the above named patient. I/We have come to the hospital voluntarily and I/We hereby certify that the above named patient is submitting voluntarily to the operation.

Being mentally capable of giving a valid authorization I/We are signing this paper of our own free will and accord.

David P. Sard, Jr.               Katie Sue Sard"
Spouse                              Patient

Two individuals, presumably hospital personnel, signed as witnesses.

Mr. Sard testified that he signed the authorization, but did not read it. He said that he could not read. He finished the eighth grade in school. He did not ask anyone to read it to him, or to explain it to him.

Mrs. Sard testified that the form was presented to her 10 or 15 minutes before she was taken to the operating room. She was told that it was necessary, to authorize the sterilization. She said that she did not read it, nor ask for any further explanation. She was not in any pain, and did not remember that she had any medication.

We do not discuss the general rule of law that a person is bound by what he signs, whether he reads it or not. The significance of the authorization is the statement that an operation intended to effect sterilization is not effective in all cases. We have already concluded in this case that the risk of failure was not material to the patient's decision.

quite the same route that we have followed, he reached the correct result when he granted a directed verdict on the second and fifth causes of action, based upon the allegation that Dr. Hardy was negligent in failing to inform Mrs. Sard adequately before obtaining her consent.

## Ruling on Evidence

We have set out the questions presented in appellants' brief. One of them asks if the court erred in refusing to allow Dr. Hawbaker to testify as to a standard of care. The short answer is that the witness simply was not asked to give such an opinion.

The court had asked the witness if he felt qualified to give an expert opinion, and the witness had said, "No, sir. Absolutely not." True, the question was couched in terms of "this hospital community", but the witness was not asked a question which might have been proper under *Shilkret v. Annapolis Emergency Hosp., supra.*

We see no erroneous ruling.

## Express Warranty

Allegations contained in the seventh and eighth causes of action asserted by Mrs. and Mr. Sard leave some doubt as to the warranty claimed. One allegation states that Dr. Hardy "expressly warranted" that the tubal ligation "would accomplish sterilization", while a later allegation refers to his "warranty" that the "the operation was a complete success".

The first suggests an expected future result. The other suggests a result already accomplished. Although it is possible to make either or both of such warranties, there is a significant difference between them. The principal difference is that an alleged warranty of a past fact has no legal validity unless it is supported by an independent consideration.

In the record in this case there is no evidence of a pre-operative warranty. Dr. Hardy's suggestion to Mrs. Sard that she be sterilized by tying her tubes cannot be construed as an express warranty of result.

Appellants rely for support of the alleged warranty upon statements which they say Dr. Hardy made to them after the operation had been performed. We quote from Mrs. Sard's direct examination:

"Q. When the Doctor said that he would sterilize you, what, in fact, what was his conversation to you about?

A. All he said was sterilize me so I thought sterilize meant fix you so you can't have no more kids, so I took it.

Q. Did the Doctor ever tell you you couldn't have any more kids after he sterilized you?

A. Yes, he did.

Q. What did he tell you?

A. On the day he let me go home from the hospital he told me before I walked out the door, 'Go home. Have all the fun you want. You don't have to worry about getting pregnant'.

Q. Before you went to the hospital did the Doctor inform you you would not have to worry about getting pregnant if you were sterilized?

A. After I was sterilized he did."

* * *

"Q. Now after you had the sterilization did you again, after a period of time, resume some type of sexual activity with your husband?

A. Yes.

Q. Did you take any precautions to prevent child birth?

A. No.

Q. Why not?

A. Because Dr. Hardy told me I was sterile and would not have to worry about getting pregnant, a guaranteed operation."

Mr. Sard was asked about his contact with Dr. Hardy in June, 1970. The transcript shows:

"A. I went to Dr. Hardy's office.

Q. Why did you go to Dr. Hardy's office then?

A. I figured he was the one that fixed her. I wanted to know whether she could get pregnant or not.

Q. Had you been to his office before that?

A. No, sir.

Q. What was your temperament, how did you feel?

A. I don't know, I just wanted to find out if she could get pregnant or not.

Q. What did the doctor say to you when you went to his office?

A. I went down there and Dr. Hardy and his nurse, and we went in the back room and I asked Dr. Hardy about it and he said, 'It ain't no way she can be pregnant. It's a guaranteed operation. Don't worry about it. Go ahead on home'."

Dr. Hardy's version of what he told Mrs. Sard when she left the hospital was, "I told her that I had tied her tubes and she should be sterile. She didn't have to worry * * * about becoming pregnant."

If these statements, viewed most favorably to the appellants, could be considered as more than ordinary medical reassurance, and could be construed as an express warranty, the warranty lacked consideration, and was invalid.

The requirement that such a contract by a physician be supported by consideration is discussed in Annotation, Contract to Effect Specific Medical Result, 43 A.L.R. 3d 1221, in which it is stated, at 1233:

"No case herein denies that the general rule of contract law that any contract must be supported by consideration to be enforceable is applicable to a

physician's contract to effect a cure or specific result. In the following cases, moreover, the courts have stated that such a contract would not be supported by the consideration paid for the physician's normal undertaking to use due care and skill, but under the particular circumstances involved, must be supported by a separate consideration."

Cases which hold that an asserted express warranty by a physician, made after the agreement to operate had been reached, must be supported by a separate consideration, are *Herrera v. Roessing,* 533 P. 2d 60 (Colo. App. 1975); *Coleman v. Garrison,* 349 A. 2d 8 (Del. Supr. 1975); *Rogala v. Silva,* 305 N.E.2d 571 (Ill. App. 1973); *Gault v. Sideman,* 191 N.E. 2d 436 (Ill. App. 1963); and *Wilson v. Blair,* 211 P. 289 (Mont. 1922).

The Annotation suggests that in cases which have not required a showing of a separate consideration, the alleged warranties were made before the agreement for the physician's services was reached.

We consider it logical, and consistent with other legal principles, to hold that an alleged express warranty cannot be enforced as a warranty unless, (1) it was made before the operation was performed, and was relied upon by the patient in contracting for the service, or, (2) it was supported by a separate consideration. We do so hold.

There was no evidence in this case of a separate consideration for the alleged express warranty made after the operation. Therefore, there was no enforceable warranty. The directed verdict on the seventh and eighth causes of action was correct.

*Judgment affirmed.*
*Appellants to pay costs.*

*Davidson, J., dissenting:*

In its opinion, the majority fails to consider material facts, fails to consider the central issue decided by the trial

court, unnecessarily decides issues, and decides those issues erroneously. I respectfully dissent.

I

Viewed in the light most favorable to the appellants,[1] the record shows that in 1965, during the eighth month of her first pregnancy, Mrs. Sard developed eclampsia and suffered 21 convulsions. It was possible, as a result, that she and her baby might die. An emergency Caesarian section was performed in an effort to save them both. The baby did not survive. In March, 1967, Mrs. Sard gave birth, again by Caesarian section, to a healthy child who survived.

In November, 1967, Mrs. Sard consulted Dr. Hardy concerning her third pregnancy. A few weeks before she was to deliver the baby he pointed out that given her past medical history, it was medically inadvisable for her to become pregnant again. He recommended that she use birth control pills or an intrauterine device, or that she have her tubes tied at the time the third Caesarian section was to be performed. He did not tell her about other methods of birth control such as vasectomy. Mrs. Sard made it plain to the doctor that she did not want any more children by explicitly saying that she had "lost a lot of blood," "couldn't afford any more children and didn't really want any more at that time." She then told him, "I would rather be sterilized because I believe it might be more safer than taking a pill. That way I will know I am sterilized and won't have to worry about having to get pregnant again."

Mrs. Sard did not know and Dr. Hardy did not then advise her that the sterilization procedure which he proposed was fallible and that she could become pregnant even after it was performed. Rather, he told her that if he performed the proposed tubal ligation she would not have any more children.[2] He gave her no information as to how successful

1. Katz v. Holsinger, 264 Md. 307, 311, 286 A. 2d 115, 118 (1972); Holloway v. Hauver, 22 Md. App. 303, 319, 322 A. 2d 890, 898-99 (1974).

2. The majority opinion indicates that there was no evidence to show that before the operation the doctor told Mrs. Sard that the proposed tubal ligation would result in permanent sterilization. The record shows that, in both the pre-trial deposition and at trial, Mrs. Sard testified that before she decided to undergo the proposed tubal ligation, the doctor told her that if

birth control pills or intrauterine devices might be in preventing pregnancy. Believing that the recommended procedure was the only certain method of permanently preventing pregnancy, Mrs. Sard chose that course of treatment. Dr. Hardy advised her to go home and think about her choice. At a subsequent visit, she elected to be "sterilized." Had she known that the operation was not necessarily effective in all cases, she would not have consented to it.[3]

that procedure were performed, she would not have any more children. More particularly, the record shows that at the trial the following colloquy took place:

Q. Now also [in your deposition did you say], "Q. Now did Dr. Hardy or any other doctor you mentioned you have consulted or having been examined by or having been operated upon prior to your decision to be sterilized give you any indication as to the continuing effect of having further children?" Your answer, "Well, Dr. Hardy, all he told me was I would not have no more, I didn't have to worry about having any more."

A. That's what he told me.

Q. He told you before your operation and before your decision to have the sterilization that you would not have any more children?

A. Yes, he did.

3. The majority states that the appellants "do not complain that the operation should not have been performed." The appellants' pleadings support an inference to the contrary. They state, in pertinent part:

That at all times herein mentioned, said Defendant was negligent in failing to inform the Plaintiff Katie Sue Sard that said surgical procedure and sterilization of her person was not absolute in nature and that a possibility did exist that she could thereafter become pregnant and that the actions and conduct of the Defendant, in failing to properly notify and inform said Plaintiff *so that she might declare her decision in accepting or rejecting said surgical procedure,* without full information or notice as to the potential results thereof, proximately brought about the Plaintiff's pregnancy and the subsequent birth of her fifth [sic] child." (Emphasis added.)

The majority also finds that Mrs. Sard "produced no evidence to show that she would have refused the operation if she had known that there was a chance of failure." Mrs. Sard's testimony establishes that she was primarily concerned with not having any more children. She objected to the other alternatives and chose the tubal ligation because she was told and believed that that procedure would prevent future pregnancies. Viewed in the light most favorable to the appellant, this testimony supports an inference that had Mrs. Sard been told that the tubal ligation might fail to sterilize her, she would have rejected it. Cobbs v. Grant, 23 Cal.App.3d 236, 100 Cal. Rptr. 98, 102 (1972); Natanson v. Kline, 187 Kan. 186, 354 P. 2d 670, 673-74 (1960); DeBarth v. Swedish Hosp. Medical Center, 81 Wash. 2d 12,

About 15 minutes before the operations were performed, a nurse told Mrs. Sard that if she wanted to be sterilized she had to sign a hospital form in order to "authorize sterilization." The form stated in pertinent part that "an operation intended to effect sterilization is not effective in all cases." Believing the form to be nothing more than an authorization for the sterilization, Mrs. Sard signed it without reading it or having it read to her, after a nurse told her she did not have time to read it. Following the operations, Dr. Hardy told Mrs. Sard, "Have all the fun you want. You don't have to worry about getting pregnant." He also stated that she was "guaranteed 100 per cent." Believing that she was sterile, Mrs. Sard thereafter engaged in sexual relations with her husband. On 11 January 1971, she gave birth by Caesarian section to a normal child.

## II

Here, the appellant contends that the question of whether she consented to the performance of the tubal ligation should have been submitted to the jury. She maintains that the evidence was sufficient to show that, because the doctor not only failed to disclose that the proposed sterilization might not prevent a future pregnancy, but rather told her that it would prevent further pregnancies, her consent to its performance was not "informed." The appellee contends that the evidence that the appellants signed a hospital form, which specifically stated that the proposed sterilization was not effective in all cases, established, as a matter of law, that the appellants' consent was "informed." The trial court, assuming without deciding that the appellants' consent had to be "informed," applied the basic principle of contract law that one who signs a contract is presumed to know its contents, nature and consequences, and is bound by its terms.[4] He agreed with the appellee that the appellants' consent was "informed."

---

499 P. 2d 1, 12-13 (1972). See Hamilton v. Hardy, 549 P. 2d 1099, 1105 (Colo. App. 1976).

4. See n. 7 below.

In my view, the only question decided by the trial judge with reference to the issue of informed consent was whether Mrs. Sard's signature on the hospital form precluded her recovery.[5] I believe that this is the only question which need be considered here.[6] I, like the trial court, would assume that the doctrine of informed consent applies in Maryland. I would, however, find that the trial court erred in applying a contract principle associated with arm's length transactions without considering the fiducial qualities of the doctor-patient relationship.

Under the principles of contract law applicable to arm's length transactions, one who signs a contract having read it or without reading it or having it read to him is presumed to know its contents, nature and consequences and is bound by

---

5. At the trial, the doctor moved for a directed verdict. During argument on the motion, the parties, like the trial judge, assumed that the doctrine of informed consent applied in Maryland. They disagreed as to the extent of the doctor's duty to disclose. Mrs. Sard contended that the doctor was required to give her accurate information concerning available alternatives and their probability of success. The doctor asserted that he was required only to inform her of available alternatives and possible physical risks "peculiarly associated with the performance of the procedure."

While the court expressed the view, in passing, that the patient had to be informed of even a one per cent chance of failure, its decision to grant the motion for directed verdict was not ultimately based either upon the finding that the doctor had a duty to disclose the success rate of the operation, or upon the fact that there was insufficient evidence to show that the doctor violated that duty.

6. Maryland Rule 1085. While it has long been recognized in Maryland that a doctor must obtain his patient's consent before undertaking a therapeutic procedure, the question of whether that consent must be "informed" has not been explicitly determined by the Court of Appeals. Questions such as the scope of the duty to disclose, whether that scope is to be determined by the standards of the profession, thus requiring expert opinion evidence or may be determined by a jury without the aid of expert opinion, whether that scope is to be determined by the objective "reasonable person" standard or a subjective standard, and the scope and extent of a doctor's privilege not to disclose, have not been resolved by that Court.

Few areas of the law presently involve more complexity and controversy than that of informed consent. See generally, Canterbury v. Spence, 464 F. 2d 772 (D.C. Cir. 1972); Natanson v. Kline, 186 Kan. 393, 350 P. 2d 1093 (1960); Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396 (1967); Informed Consent — A Proposed Standard for Medical Disclosure, 48 N.Y.U. L.Rev. 548 (1973); 75 Harv.L.Rev. 1445 (1962). In my view, such questions should be resolved by this Court only when absolutely necessary.

its terms.[7] Even an illiterate who executes a contract under a mistake as to its contents is bound.[8]

The rationale underlying this presumption is that in an arm's length transaction the relationship between the parties is such that each is independent of the other, has no duty or obligation to the other, and is responsible solely for protecting his own interests. Accordingly, a signatory to a contract in an arm's length transaction has an obligation to inform himself and is negligent if he fails so to do.[9] As stated in *Spitze v. Baltimore & Ohio R.R.*:[10]

> ... it would lead to startling results if a person who executes, without coercion or undue persuasion, a solemn release under seal, can subsequently impeach it on the ground of his own carelessness, though at the very time of its execution, he might, had he seen fit, have advised himself fully as to the nature and legal effect of the act he was doing. He cannot, under these circumstances, be heard to complain that an imposition was practised upon him. He cannot invoke his own heedlessness to impeach his solemn release, and then call that heedlessness some one else's fraud. If he did not know what he was signing, it was his plain duty to inquire. He had no right to act as one who understood what he was doing, unless he intended

---

7. Merit Music v. Sonneborn, 245 Md. 213, 220, 225 A. 2d 470, 474 (1965); Rossi v. Douglas, 203 Md. 190, 199, 100 A. 2d 3, 7 (1953); Western Maryland Dairy Corp. v. Brown, 169 Md. 257, 262, 181 A. 468, 471 (1935) (dictum); Spitze v. Baltimore & Ohio R.R., 75 Md. 162, 171, 23 A. 307, 310 (1892); Wolfe v. Madison Nat'l Bank, 30 Md. App. 525, 531, 352 A. 2d 914, 917 (1976). *See* Canaras v. Lift Truck Services, 272 Md. 337, 344, 322 A. 2d 866, 870 (1974).

8. Rossi, *supra,* 203 Md. at 199, 100 A. 2d at 7; Wilson v. Pritchett, 99 Md. 583, 593, 58 A. 360, 362 (1904); Spitze, *supra,* 75 Md. at 169-71, 23 A. at 309-10; Serdenes v. Aetna Life Ins. Co., 21 Md. App. 453, 461-62, 319 A. 2d 858, 863 (1974).

9. Merit Music, *supra,* 245 Md. at 224-25, 225 A. 2d at 474-75; Boyle v. Rider, 136 Md. 286, 291, 110 A. 524, 526 (1920); Smith v. Humphreys, 104 Md. 285, 290-91, 65 A. 57, 59 (1906); Spitze, *supra,* 75 Md. at 171, 23 A. at 310.

10. 75 Md. 162, 171, 23 A. 307, 310 (1892).

to lead those with whom he was dealing to believe
that he did understand the act that he did.

Different considerations are involved when there is a
fiducial relationship between the parties. In *Herring v.
Offutt*,[11] the Court of Appeals quoted with approval Justice
Cardozo, then Chief Judge of the New York Court of
Appeals: [12]

" Many forms of conduct permissible in a
workday world for those acting at arm's length, are
forbidden to those bound by fiduciary ties. A
trustee is held to something stricter than the
morals of the market place. Not honesty alone, but
the punctilio of an honor the most sensitive, is then
the standard of behavior. As to this there has
developed a tradition that is unbending and
inveterate. Uncompromising rigidity has been the
attitude of courts of equity when petitioned to
undermine the rule of undivided loyalty by the
'disintegrating erosion' of particular exceptions.
Only thus has the level of conduct for fiduciaries
been kept at a level higher than that trodden by the
crowd."

In a fiducial relationship, one of the parties is justifiably
dependent to some extent upon the other. Consequently, the
dominant party has certain duties and obligations toward
the other and is responsible for protecting the other's
interests. Included among those duties and obligations is a
duty to disclose any information which it is important for
the other party to know.[13] The dependent party is not
obligated to inform himself and is entitled to rely upon the
dominant party to provide him with the information he

11. 266 Md. 593, 597, 295 A. 2d 876, 879 (1972).

12. Meinhard v. Salmon, 249 N. Y. 458, 164 N. E. 545, 546 (1928).

13. Herring, *supra*, 266 Md. at 597, 295 A. 2d at 879; Hall v. Hall, 147 Md.
184, 191-92, 127 A. 858, 861 (1925); Williams v. Williams, 63 Md. 371, 397-98
(1885); Todd v. Grove, 33 Md. 188, 192 (1870); *see also* Gingell v. Backus, 246
Md. 83, 92, 227 A. 2d 349, 353 (1967).

needs.[14] Accordingly, the dependent party's failure to inform himself does not constitute negligence and such a party is not precluded from showing a lack of knowledge of the contents, nature and consequences of a signed document. In short, where there is a fiducial relationship between the parties, the presumption of knowledge of the contents of a written document does not apply.[15] As stated in dicta in *Bollack v. Bollack*: [16]

> ... the natural and ordinary presumption is, that where one in the full possession of his mental faculties executes a deed, will, or other instrument, conferring a benefit upon another, by affixing his signature thereto, that his act is free, intentional, and voluntary.... *But the presumption* is rebuttable, and *has no application* where a beneficiary under the instrument stands in a confidential relation to the donor. (Emphasis added.)

In Maryland, a confidential or fiduciary relationship is presumed "whenever two persons stand in such a relation to each other that one must necessarily repose trust and confidence in the good faith and integrity of the other," [17] and "where the one in whom such confidence is reposed is thereby enabled to exert a dominating and controlling influence over the other." [18] It has long been recognized implicitly that a physician occupies a position of trust and confidence in relation to his patient.[19] Courts in other

---

14. Desser v. Woods, 266 Md. 696, 709, 296 A. 2d 586, 593 (1972); Herring, *supra*, 266 Md. at 600-01, 295 A. 2d at 880-81; *see also* Merchants Mortgage Co. v. Lubow, 275 Md. 208, 215-16, 339 A. 2d 664, 669 (1975).

15. Desser, *supra*, 266 Md. at 708-09, 296 A. 2d at 593; Farmer v. O'Carroll, 162 Md. 431, 444-46, 160 A. 12, 17 (1932); Cumberland Coal & Iron Co. v. Parish, 42 Md. 598, 606-07 (1875); Todd, *supra*, 33 Md. at 195-96.

In addition to establishing the inapplicability of the presumption of knowledge, these cases further shift the burden of proof on the question of knowledge from the dependent party to the dominant party.

16. 169 Md. 407, 410-11, 182 A. 317, 318 (1935).

17. Gaver v. Gaver, 176 Md. 171, 185, 4 A. 2d 132, 139 (1939).

18. Tracey v. Tracey, 160 Md. 306, 318, 153 A. 80, 85 (1931).

19. Williams, *supra*, 63 Md. at 404 (dissenting opinion); Todd, *supra*, 33 Md. at 194.

jurisdictions agree.[20] Thus, the Court of Appeals of Missouri has said: [21]

> A physician occupies a position of trust and confidence as regards his patient — a fiduciary position. It is his duty to act with the utmost good faith. This duty of the physician flows from the relationship with his patient and is fixed by law — not by the contract of employment. The law's exaction of good faith extends to all dealings between the physician and the patient. A person in ill health is more subject to the domination and influence of another than is a person of sound body and mind. The physician has unusual opportunity to influence his patient. Hence, all transactions between physician and patient are closely scrutinized by the courts which must be assured of the fairness of those dealings. (Citations omitted.)

I am convinced that there are fiducial qualities in the doctor-patient relationship which require the application of principles different from those governing arm's length transactions. Applying such principles to the instant case would produce a clear result.

Under the doctrine of informed consent, it is the fiducial quality of the relationship between the doctor and the patient which imposes upon the doctor an obligation to disclose to the patient all material facts reasonably necessary to provide the basis of an informed intelligent

---

20. Canterbury, *supra*, 464 F. 2d at 782; Sheets v. Burman, 322 F. 2d 277, 279 (5th Cir. 1963); Lilly v. Comm'r of Internal Revenue, 188 F. 2d 269, 271 (4th Cir. 1951), *rev'd on other grounds*, 343 U. S. 90 (1952); Hammonds v. Aetna Casualty & Surety Co., 243 F. Supp. 793, 802-03 (N.D. Ohio 1965); Berkey v. Anderson, 1 Cal.App.3d 790, 82 Cal. Rptr. 67, 77-78 (1970); Stacey v. Pantano, 177 Neb. 694, 131 N.W.2d 163, 165 (1964); Demers v. Gerety, 87 N. M. 52, 529 P. 2d 278, 280 (1974); Allison v. Blewett, 348 S.W.2d 182, 184 (Tex.Civ.App. 1961); Hunter v. Brown, 4 Wash. App. 899, 484 P. 2d 1162, 1166 (1971); Mason v. Ellsworth, 3 Wash. App. 298, 474 P. 2d 909, 916 (1970); 41 Am. Jur., *Physicians & Surgeons*, § 74; *see* Davis v. Arizona State Dental Board, 57 Ariz. 239, 112 P. 2d 870, 877 (1941); Mattingly v. Sisler, 198 Okl. 107, 175 P. 2d 796, 799 (1946); Alexander v. Knight, 197 Pa. Super. 79, 177 A. 2d 142, 146 (1962); Hodge v. Shea, 252 S. C. 601, 168 S.E.2d 82, 84, 87 (1969).

21. Moore v. Webb, 345 S.W.2d 239, 243 (Mo. 1961).

decision as to a proposed treatment. Thus, the U.S. Court of Appeals for the District of Columbia Circuit in determining that it is the doctor's duty to impart information which the patient has every right to expect, including the available therapy alternatives and the goals expectably to be achieved, has said: [22]

> The patient's reliance upon the physician is a trust of the kind which traditionally has exacted obligations beyond those associated with arms-length transactions. His dependence upon the physician for information affecting his well-being, in terms of contemplated treatment, is well-nigh abject. As earlier noted, long before the instant litigation arose, courts had recognized that the physician had the responsibility of satisfying the vital informational needs of the patient. More recently, we ourselves have found "in the fiducial qualities of [the physician-patient] relationship the physician's duty to reveal to the patient that which in his best interests it is important that he should know."

Similarly, the Supreme Court of California has said: [23]

> ... the patient, being unlearned in medical sciences, has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process, thus raising an obligation in the physician that transcends arms-length transactions.

It is also the fiducial quality of the relationship which relieves the patient from the obligation to inform himself. If the doctor fails to provide the material facts necessary for an intelligent decision, the patient's consent to the proposed treatment, being uninformed, is invalid.[24]

---

22. Canterbury, *supra*, 464 F. 2d at 782.

23. Cobbs v. Grant, 104 Cal. Rptr. 505, 513, 502 P. 2d 1, 9 (1972).

24. Canterbury, *supra*, 464 F. 2d at 783; Dunham v. Wright, 423 F. 2d 940, 943-44 (3d Cir. 1970); Berkey, *supra*, 82 Cal. Rptr. at 77; Salgo v. Leland Stanford Jr. University Bd. of Trustees, 154 Cal.App.2d 560, 317 P. 2d 170,

If the doctor does provide information to the patient, the patient has the right to rely upon the fact that it is accurate and complete. A patient would not normally expect that a consent form which he was asked to sign would contain material different from that provided by the doctor.[25] Because under such circumstances the patient would have no obligation to inform himself, he should not be presumed to know the contents of a signed consent form.[26]

Here, there was evidence to show that before she decided to undergo a tubal ligation, the doctor told the patient that if the procedure were performed she would not have any more children. Fifteen minutes before the operation, hospital personnel told her that if she wanted to be sterilized she had to sign an authorization form. That form indicated that sterilization is not effective in all cases. In addition, hospital personnel told her that she did not have time to read the form. Under these circumstances, she signed the form without reading it or having it read to her.

In the absence of a presumption that she knew the contents of the document she signed, this evidence was sufficient to raise a question as to whether the patient knew that the proposed tubal ligation would not necessarily be effective.[27] Again, assuming without deciding that the

181 (1957); Natanson v. Kline, 186 Kan. 393, 350 P. 2d 1093, 1106-07 (1960); Getchell v. Mansfield, 260 Ore. 174, 489 P. 2d 953, 954-55 (1971); Cooper v. Roberts, 220 Pa. Super. 260, 286 A. 2d 647, 649 (1971); Gray v. Grunnagle, 423 Pa. 144, 223 A. 2d 663, 674 (1966); Ball v. Mallinkrodt Chemical Works, 53 Tenn. App. 218, 381 S.W.2d 563, 567 (1964); Holt v. Nelson, 11 Wash. App. 230, 523 P. 2d 211, 216 (1974).

25. Campbell v. Oliva, 424 F. 2d 1244, 1251 (6th Cir. 1970).

26. See Campbell, supra, 424 F. 2d at 1251; Gray, supra, 223 A. 2d at 674.

See also n. 13 above. The cases there cited establish not only that where there is a fiducial relationship, a presumption of knowledge of the contents, nature and consequences of a signed document is inapplicable, but also that the burden of proof on the question of knowledge is shifted.

The Court of Appeals of Maryland has placed the burden of proof in malpractice actions upon the patient. State, ex rel. Janney v. Housekeeper, 70 Md. 162, 171, 16 A. 382, 384 (1889). I wish to make it clear that I would not here incorporate into malpractice actions all of the ramifications of fiduciary law. While I would hold that under the present circumstances a presumption of knowledge is inapplicable, I would not shift the burden of persuasion on the question of knowledge from the patient to the doctor. See Demers, supra, 529 P. 2d at 280.

27. It is unnecessary to consider whether the husband knew or should

patient's consent had to be "informed," and that the doctor had a duty to disclose accurate, relevant information to the patient, that question should have been submitted to the jury. Accordingly, I would reverse and remand for a new trial.

### III

The majority fails to consider the question of whether Mrs. Sard's signature on the hospital form precluded her recovery. Instead, they unnecessarily decide that the doctrine of informed consent is applicable in Maryland and that under that doctrine, a doctor has a duty to make *"an adequate disclosure of substantial facts which would be material to the patient's decision."* They then delineate the scope of the duty to disclose as disclosure of risks of death or bodily harm peculiar to the proposed procedure. They make it plain that there is no need to disclose risks that are likely to be known by the average patient, or that are in fact known by the patient. Moreover, they determine that there is no duty to discuss the relatively minor risks inherent in common procedures when it is common knowledge that such risks are of very low incidence. The majority finds that materiality is "the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment." They hold that "a reasonable person, in Mrs. Sard's position, would attach no material significance to the risk of one chance in fifty that she would derive no benefit from the operation."

Were I to consider the questions of the scope of the doctor's duty to disclose and whether there was sufficient evidence of a breach of that duty to require submission to the jury, I would reach the opposite result. I agree with the majority that the scope of the doctor's duty to disclose information to the patient is determined by the patient's

---

have known the contents of the consent form. The wife's consent, not her husband's, was necessary. Housekeeper, *supra,* 70 Md. at 170, 16 A. at 384.

need to know. As stated by the Court of Appeals of Washington: [28]

> The inquiry as to each item of information . . . is "Would the patient as a human being consider this item in choosing his or her course of treatment?"

I do not believe that these "items of information" are limited to disclosure of risks of physical harm resulting from the operation. I would delineate the scope of the doctor's duty to disclose differently from the majority by clearly articulating that additional factors are included.

Some courts which have considered the scope of the doctor's duty to disclose have indicated that:

> . . . before a patient will be deemed to give an informed consent, *it may be necessary that he know the alternative methods of treatment available to him* and the inherent dangers *and possibilities of success of such alternatives.*[29] (Emphasis added.)

Other courts have indicated that the duty to disclose not only requires a doctor to provide adequate information, but also accurate information. They recognize that the duty to disclose prohibits a doctor from giving misleading information. As stated by the Supreme Court of New Mexico: [29a]

> A physician who misleads a patient by not only failing to give a warning of reasonable and recognized risks inherent in a treatment after which the patient would have refused the treatment, but by affirmatively assuring her that there are no risks, knowing such statement to be

---

**28.** Miller v. Kennedy, 11 Wash. App. 272, 522 P. 2d 852, 860 (1974).

**29.** Dunham, *supra,* 423 F. 2d at 944. *See* Canterbury, *supra,* 464 F. 2d at 782, n.27; Russell v. Harwick, 166 So. 2d 904, 905 (Fla. 1964); Bang v. Charles T. Miller Hosp., 251 Minn. 427, 88 N.W.2d 186, 190 (1958); Gray, *supra,* 223 A. 2d at 669-70; Miller, *supra,* 522 P. 2d at 860; Hunter, *supra,* 484 P. 2d at 1167. *See also,* Powell, "Consent to Operation," 21 Md.L.Rev. 189, 192-93 (1961); Louisell & Williams, Medical Malpractice § 22.01 (1976).

**29a.** Woods v. Brumlop, 71 N. M. 221, 377 P. 2d 520, 525 (1962). *See* Berkey, *supra,* 82 Cal. Rptr. at 77.

untrue, is liable for the harmful consequences of the treatment. Such a failure to disclose, *or the giving of an untrue answer as to the probable consequences of a treatment constitutes malpractice*; and a doctor who fails to so advise his client, or gives an untrue answer as to such consequences, is liable for malpractice unless his failure to do so comes within one of the exceptions to the rule requiring candor and disclosure. Under the circumstances of this case, a fact issue was presented for determination by the jury . . . (Emphasis added.)

I would hold that under appropriate circumstances, the doctor's duty to disclose requires him to give a patient adequate and accurate information concerning the alternative methods of achieving a therapeutic goal and the relative chance of success of each of those alternatives. Applying this standard to the instant case would produce a clear result.

Here, the facts, many of which were not even considered by the majority, show that the appellant was not concerned with the possibility of physical harm resulting from the performance of the tubal ligation, but rather was concerned with the question of what available method of birth control would give her the greatest possibility of achieving total, permanent sterility. The record further shows that before she made her decision, her doctor advised her of three available alternative methods of birth control — pills, an intrauterine device, and a tubal ligation. He failed to advise her of other methods such as vasectomy. Moreover, with respect to two of the three suggested methods, birth control pills and intrauterine devices, he gave her no information. He failed to tell her how successful they might be in preventing pregnancy. With respect to the third method, tubal ligation, he gave her misinformation. He not only failed to tell her that that method was fallible, but rather told her that if that procedure were performed, she would not have any more children. Having provided her with this inadequate and inaccurate information, he told her to go

home and think about which of the alternatives she wished to pursue. Relying upon this inadequate information and misinformation, she elected the tubal ligation procedure.

On the basis of these facts, I cannot conclude, as a matter of law, that the doctor adequately disclosed "substantial facts material to the patient's decision." Indeed, on the basis of these facts, I cannot conceive that a reasonable person could reach an intelligent and informed decision as to which of the suggested alternatives should be pursued. I would have concluded that, under the circumstances here, the doctor had a duty to provide the patient with adequate and accurate information concerning available alternative methods of birth control and the relative chance of success of each of those alternatives. I would further have found that the question of whether the doctor breached his duty to disclose should be submitted to the jury.

Moreover, I cannot agree with my colleagues that, as a matter of law, under the present circumstances "a reasonable person, in Mrs. Sard's position, would attach no material significance to the risk of one chance in fifty that she would derive no benefit from the operation." [30] I believe

---

**30.** In reaching their conclusion, the majority considered three factors:

1) that "the physical harm to the patient was zero;"
2) "that there was one chance in fifty that the benefit would be zero;"
3) that Mrs. Sard "produced no evidence to show that she would have refused the operation if she had known that there was a chance of failure."

The fact that physical harm resulting from the operation was zero is irrelevant. The question here is not whether the doctor violated a duty to disclose risks of bodily harm peculiar to the proposed procedure, but rather whether the doctor violated a duty to disclose alternative methods of treatment and their success rates. Moreover, while physical harm to the patient resulting from a breach of the duty to disclose is relevant to the issue of proximate cause and damages, it has no bearing on the issues of the scope of the duty to disclose and the breach of that duty.

Mrs. Sard did, in my view, produce evidence that she would not have consented to the operation had she known that there was a chance of failure. *See* n.3 above. Even if she had failed to produce such evidence, that fact would be irrelevant. Evidence that disclosure would not have resulted in a decision against the proposed procedure, like evidence of physical harm resulting from a failure to disclose risks, is relevant to the issue of proximate cause, and has no bearing on the issues of the scope of the duty to disclose and the breach of that duty. *See* Canterbury, *supra,* 464 F. 2d at 790-91.

that in determining the significance a reasonable person would attach to a risk, one must consider not only its incidence, but also the severity of its potential consequences. As the court in *Canterbury* stated: [31]

> A very small chance of death or serious disablement may well be significant; a potential disability which dramatically outweighs the potential benefit of the therapy or the detriments of the existing malady may summons discussion with the patient.
>
> There is no bright line separating the significant from the insignificant; the answer in any case must abide a rule of reason. . . . The disclosure doctrine, like others marking lines between permissible and impermissible behavior in medical practice, is in essence a requirement of conduct prudent under the circumstances. Whenever nondisclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts.

In accord with this rationale, courts in other states have recognized that the jury should determine whether a particular risk should have been disclosed, when there was evidence that that risk was of low incidence but serious consequence.[32]

---

**31.** Canterbury, *supra* at 788.

**32.** Canterbury, *supra*, 464 F. 2d 772 (1% risk of paralysis); Cobbs, *supra*, 104 Cal. Rptr. 505 (5% risk of injury to spleen); Berkey, *supra*, 82 Cal. Rptr. 67 ("rare and remote" incidence of foot drop); Hamilton v. Hardy, 549 P. 2d 1099 (Colo. App. 1976) ("possible relationship" between the use of oral contraceptives and thromboembolism); Coleman v. Garrison, 349 A. 2d 8 (Del. Supr. 1975) (1%-2% chance of pregnancy after a tubal ligation); Fogal v. Genesee Hospital, 41 A.D.2d 648, 344 N.Y.S.2d 552 (1973) ("rare and unlikely" possibility of necrotic injuries); Cooper, *supra*, 286 A. 2d 647 (1 in 2500 risk of perforation of stomach); Hunter, *supra*, 484 P. 2d 1162 ("minimal risk" that "dermabrasion" might not be successful in removing dark pigmentation spots from patient's face); Bowers v. Talmage, 159 So. 2d 888 (Fla. 1963) (3% risk of paralysis). Contra, Starnes v. Taylor, 272 N. C. 386, 158 S.E.2d 339 (1968) (1/4 of 1% risk of perforation of esophagus; Mason v. Ellsworth, 3 Wash. App. 298, 474 P. 2d 909 (1970) (1/4 to 3/4 of 1% risk of perforation of esophagus).

It is interesting to note that in Cobbs, *supra*, 104 Cal. Rptr. 505, and Wilkinson v. Vesey, 295 A. 2d 676 (R.I. 1972), upon which the majority relies

Here, the record shows that there was a two per cent chance that a person could become pregnant, notwithstanding the performance of a tubal ligation. It also shows that what I regard as serious consequences would flow if a person with Mrs. Sard's past medical history were to become pregnant again. Pregnancy for any woman entails some physical discomfort. A person with Mrs. Sard's past medical history would have been told by her own doctor that further pregnancies were medically inadvisable. She would suffer more than the usual physical discomforts of pregnancy. In addition, she would suffer the emotional stress and anxiety created by the fear of serious physical disability or death resulting from the performance of a Caesarian section. Moreover, she would undergo the pain and discomfort associated with that major surgery. Finally, assuming that neither she nor the baby died or were physically harmed, she would have to live with the cost, and, in some instances, the emotional stress of raising an unwanted child. Given the serious consequences which would befall a person in Mrs. Sard's position, were she to become pregnant, I am unable to conclude, as a matter of law, that in deciding to undergo a tubal ligation such a person would attach no material significance to the fact that she had a two per cent chance of becoming pregnant after that procedure was performed. Under the circumstances here, I believe that the question of whether the doctor made an adequate disclosure of substantial facts which would have been material to the patient's decision should have been submitted to the jury. Accordingly, I would have reversed.

## IV

The majority additionally unnecessarily decides that the evidence was insufficient to require that the question of whether there was a breach of an enforceable express warranty be submitted to the jury. They hold that an alleged express warranty cannot be enforced unless "1) it was made

to establish the standard for the duty to disclose, the question of adequate disclosure was submitted to the jury. In Cobbs, there was a 5% possibility of injury to the spleen.

before the operation was performed, and was relied upon by the patient in contracting for the service, or 2) it was supported by a separate consideration." They say that "in the record in this case there is no evidence of a pre-operative warranty." They find that "there was no evidence in this case of a separate consideration for the alleged express warranty made after the operation." They conclude that "there was no enforceable warranty."

Were I to consider the question of whether there was sufficient evidence of a breach of an enforceable express warranty to require submission to the jury, I would reach the opposite result. I agree with the majority that an express warranty made before the operation was performed and relied upon by the patient in contracting for the service can be enforced without a separate consideration.[33] I disagree with the majority that here "there is no evidence of a pre-operative warranty."

In Maryland, the question of whether a doctor's representation as to the effectiveness of a proposed therapeutic procedure constitutes an enforceable express warranty or is nothing more than an "ordinary medical reassurance" has not been considered. Some courts have recognized that such representations can constitute express warranties.[34] Other courts which have considered the question of whether a particular representation is a "warranty" or a "reassurance" have recognized that it involves a question of fact which ordinarily should be submitted to the jury.[35] I agree.

Here, the record shows that before Mrs. Sard decided to undergo the proposed tubal ligation, the doctor told her that if that procedure were performed she would not have any

---

**33.** Guilmet v. Campbell, 385 Mich. 57, 188 N.W.2d 601, 605-607 (1971). *Contra,* Coleman, *supra,* 349 A. 2d at 11; Rogala v. Silva, 16 Ill.App.3d 63, 305 N.E.2d 571, 573 (1973).

**34.** Custodio v. Bauer, 251 Cal.App.2d 303, 59 Cal. Rptr. 463, 471 (1967); Vilord v. Jenkins, 226 So. 2d 245, 246 (Fla. App. 1969). See 41 Am. Jur., *Physicians & Surgeons* § 105.

**35.** Crawford v. Duncan, 61 Cal. App. 647, 215 P. 573, 574 (1923); Guilmet, *supra,* 188 N.W.2d at 606; Hawkins v. McGee, 84 N. H. 114, 146 A. 641, 643 (1929). *See* Perin v. Hayne, 210 N.W.2d 609, 616 (Iowa 1973).

more children.[36] She made it plain to her doctor that her reason for electing and undergoing the proposed tubal ligation was the fact that it would result in total permanent sterility. Had she known that the proposed procedure was fallible, she would not have agreed to have the tubal ligation performed.[37]

This evidence is sufficient to show that here the doctor made an express promise to effect a specific result which was relied upon by Mrs. Sard in contracting for the tubal ligation and before the operation was performed. It was, therefore, sufficient to support a finding that there was a pre-operative express warranty. The issue should have been submitted to the jury. Accordingly, I would have reversed.

---

**36.** *See* n.2 above.
**37.** *See* n.3 above.